GATZ PROPERTIES, LLC, a Delaware limited liability company, and William A. Gatz, Defendant Below, Appellants,

v.

AURIGA CAPITAL CORPORATION, a Delaware Corporation, Paul Rooney, Hakan Sokmenseur, Don Kyle, Ivan Benjamin, and Glenn Morse, Plaintiffs Below, Appellees.

No. 148, 2012.

Supreme Court of Delaware.

Submitted: Sept. 19, 2012.
Decided: Nov. 7, 2012.

Steven L. Caponi (argued) and Elizabeth A. Sloan, Esquires, Blank Rome LLP, Wilmington, Delaware, for appellants.

John L. Reed (argued), R. Craig Martin and Scott B. Czerwonka, Esquires, DLA Piper LLP, Wilmington, Delaware, for appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

PER CURIAM:

In resolving this dispute between the controlling member-manager and the minority investors of a Delaware Limited Liability Company ("LLC"), we interpret the LLC's governing instrument (the "LLC Agreement") as a contract that adopts the equitable standard of entire fairness in a conflict of interest transaction between the LLC and its manager. We hold that the manager violated that contracted-for fiduciary duty by refusing to negotiate with a third-party bidder and then, by causing the company to be sold to himself at an unfair price in a flawed auction that the manager himself engineered. For that breach of duty the manager is liable. Because the manager acted in bad faith and made willful misrepresentations, the LLC Agreement does not afford him exculpation. We **AFFIRM** the damages award solely on contractual grounds. We also **AFFIRM** the court's award of attorneys' fees.

## I. FACTUAL AND PROCEDURAL HISTORY

In 1997, Gatz Properties, LLC and Auriga Capital Corp., together with other minority investors,[1] formed Peconic Bay, LLC, a Delaware limited liability company ("Peconic Bay"). That entity was formed to hold a long-term lease and to develop a golf course on property located on Long Island that the Gatz family had owned since the 1950s.

The instrument that governed Peconic Bay was the Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"). The Gatz family and their affiliates controlled over 85% of the Class A membership interests, and over 52% of the Class B membership interests of Peconic Bay. The LLC Agreement requires that 95% of all cash distributions first be made to the Class B members until they recoup their investment. Thereafter, the cash distributions are to be made to all members pro rata.

The LLC Agreement designated Gatz Properties as manager. Gatz Properties was managed and controlled by William Gatz ("Gatz"), who also managed, controlled, and partially owned Gatz Properties.[2] The LLC Agreement precluded the manager from making certain major decisions without the prior approval of 66 2/3% of the Class A and 51% of the Class B membership interests. The Gatz family owned the requisite percentages of those membership interests. As a consequence, the family had a veto power over any

---

1. William Carr manages Auriga Capital. This Opinion sometimes refers to all of the minority members of Peconic Bay, LLC (including Auriga Capital) as "Auriga."

2. Because at all relevant times William Gatz was the sole actor on behalf of Gatz Properties, this Opinion sometimes refers to Gatz Properties or the Gatz family interests as "Gatz."

decision to (among other things) sell Peconic Bay, to enter into a long-term sublease with a golf course operator or permit Peconic Bay to operate the course itself.

Beginning January 1, 1998, Gatz Properties leased the family property to Peconic Bay under a Ground Lease that ran for an initial 40–year term, with an option to renew for two ten-year extensions. The Ground Lease limited the property's use to a high-end, daily fee, public golf course. The LLC Agreement contemplated that a third party would operate the golf course. (Peconic Bay could not operate the golf course itself without majority membership interest approval.) To finance the golf course construction, Peconic Bay borrowed approximately $6 million, evidenced by a Note secured by the property. The LLC Agreement contemplated that Gatz Properties, as manager, would collect rent from the third-party golf course operator, make the required payments on the Note, and then distribute the remaining cash as the LLC Agreement provided.

On March 31, 1998, Peconic Bay entered into a sublease (the "Sublease") with American Golf Corp., a national golf course operator. The Sublease ran for a term of 35 years, but granted American Golf an early termination right after the tenth year of operation. Under the Sublease, American Golf would pay rent to Peconic Bay, starting at $700,000 per year and increasing annually by $100,000, until leveling out to $1 million per year in 2003. American Golf would also pay additional rent amounting to 5% of the revenue from its golf course operations. Under the Ground Lease between Gatz Properties and Peconic Bay, the revenue-based portion of the rent would "pass through" directly to Gatz Properties.

The golf course's operations were never profitable. Both sides characterized American Golf as a "demoralized operator" that neglected maintenance items to the extent that the poor condition of the course adversely affected revenue. By at least 2005, Gatz knew that American Golf would elect to terminate the Sublease in 2010. Anticipating that, in 2007 Gatz commissioned an appraisal that valued the land with the golf course improvements at $10.1 million, but at a value 50% higher—$15 million—as vacant land available for development. By mid–2009, again in anticipation of the sublease's termination, Gatz Properties had set aside almost $1.6 million in cash under Section 11 of the LLC Agreement, which authorized the manager to retain distributions reasonably necessary to meet present or future obligations.

In August 2007, Matthew Galvin, on behalf of RDC Golf Group, Inc. ("RDC"), contacted Gatz and expressed an interest in acquiring Peconic Bay's long-term lease. Galvin asked Gatz to permit RDC to conduct basic due diligence, and told Gatz that he was willing to enter into a confidentiality agreement. Gatz refused to provide the requested due diligence information, and moreover, criticized Galvin's gross revenue projections of $4 million as overly optimistic.

Nevertheless, Galvin submitted a nonbinding letter of intent to Gatz, offering to acquire the Peconic Bay Ground Lease and the Sublease, exclusive of other assets and liabilities, for $3.75 million. Gatz put the Galvin offer to a membership vote, knowing that the offer would be rejected not only because it would render Peconic Bay insolvent,[3] but also because the Gatz family intended to vote its controlling interest against the offer.

**3.** Peconic Bay's debt exceeded $5.4 million. Even accounting for the cash reserves, an offer of $3.75 million would leave Peconic Bay insolvent.

Galvin later submitted a second offer, this time for $4.15 million. Gatz put Galvin's second bid up for a membership vote, and the members unanimously rejected that offer as well. On November 12, 2007, Auriga Capital's William Carr suggested that Gatz should ask Galvin if he would agree to a deal at $6 million. Purportedly following up that suggestion, Gatz told Galvin on December 14, 2007 that "no further discussions would be fruitful unless RDC is willing to discuss a price *well north* of $6 million."[4] On December 29, 2007, Galvin responded that RDC "may have an interest north of $6 million," and asked Gatz to suggest a target range of values. Gatz refused to suggest a range. On January 4, 2008, Galvin wrote, "[W]e may be able to get more aggressive but that would probably open up a can of worms—for example, we could offer more money but would want to extend the lease term." Thereafter, Galvin asked Gatz to sit down with him and negotiate, but Gatz did not respond.

On January 22, 2008, Galvin proposed a "Forward Lease" whereby RDC would take over the Sublease from American Golf if American Golf exercised its 2010 early termination option. RDC would maintain the Sublease's noneconomic features, but would renegotiate the rent terms. Again, Gatz made no response. The reason is that Gatz himself wanted to acquire the Sublease and Peconic Bay's other assets.

The proof is that one week earlier, on January 14, 2008, Gatz had written to Peconic Bay's minority investors and offered to purchase their interests for a "cash price equal to the amount which would be distributed for those interests as if [Peconic Bay's] assets sold for a cash price of $5.6 million as of today." Gatz characterized his offer as equivalent to a sale price of over $6 million, by not having to pay certain related closing costs and prepayment penalties that would result if the buyer were a third party. The Gatz letter then informed the minority investors that "[n]egotiations with RDC have broken off with their best offer of $4.15 million being rejected. Offering a counter proposal of $6 million to RDC as Bill Carr suggested did not receive majority approval from the members." What Gatz did not tell the minority investors was that Galvin had expressed an interest in negotiating an offer "north of $6 million," and that Gatz had never responded. As his "bottom line," Gatz offered the minority members $734,131, conditioned on their unanimous acceptance.

All but one of the minority members rejected that offer. Gatz then changed strategy and hired Laurence Hirsh to appraise the property, but without giving Hirsh complete information. Gatz did not inform Hirsh of Galvin's $4.15 million offer, of Galvin's gross revenue projections of $4 million which implied a value of $6 to 8 million, or that American Golf was a "demoralized operator." As a result, Hirsh relied solely on American Golf's historical financials and data from comparable courses in the geographic area. On that basis Hirsh appraised Peconic Bay's leasehold, as of June 2008, at $2.8 million as a daily fee golf course, and at $3.9 million as a private golf course. Relying on Hirsh's appraisal as proof that Peconic Bay had no net positive value, Gatz then made a new offer to the minority members on August 7, 2008. This time Gatz offered to pay 25% of each member's capital account balance. In connection with that offer, Gatz also retained Blank Rome LLP

---

4. *Auriga Capital Corp. v. Gatz Props., LLC,* 40 A.3d 839, 865 (Del.Ch.2012) (emphasis added).

as legal counsel. That firm advised the LLC's minority members that:

> Under the provisions of the [LLC Agreement], the majority members have the right to vote out the minority members, *so long as a fair price is paid for the interests of the minority members.* Given the existing debt which [Peconic Bay] is obligated to repay, as well as the value determined by [Hirsh], *that value is, at best, zero. Thus, the offer to the minority members to pay substantially more than zero to acquire the interest[s] of the minority members is more than fair. . . .*
>
> *If the minority members are not willing to negotiate a resolution of the value of their interests in [Peconic Bay], the majority will have no choice but to file an appropriate action with the Delaware Court of Chancery to establish such a price through the litigation process.*[5]

On December 8, 2008, Gatz formally proposed to sell Peconic Bay at auction and informed the minority members that Gatz Properties intended to bid. Exercising their majority voting power, the Gatz family and their affiliates approved Gatz's auction proposal. By this point, Peconic Bay had almost $1.4 million in cash reserves and debt service of about $520,000 per year.

Assisted by Blank Rome, Gatz next hired an auctioneer in February 2009. Although Gatz claimed to have considered three different auction firms, he hired Richard Maltz of Maltz Auctions, Inc. ("Maltz"). Maltz specialized in "debt related" sales and conducted the majority of its work in connection with bankruptcy court proceedings, but had never auctioned off a golf course. Gatz and Maltz entered into an agreement in late May 2009, whereby the golf course would be marketed for 90 days, after which the auction would take place on August 18, 2009. As actually carried out, the marketing effort consisted of small-print classified advertisements in general circulation newspapers and in a few magazines, online advertisements on websites, and direct mailings. At trial, Maltz was unable to produce documents or testimony evidencing the content of the direct mailings. The Court of Chancery found no credible evidence that any golf course brokers, managers, or operators had ever been contacted. The court also found that Gatz had not informed Maltz about the RDC bids or suggested that Maltz contact Galvin.[6]

Due diligence materials, which the trial court described as "less than optimal," were made available to potential bidders on or about July 16, 2009, for a $350 fee.[7] In mid-July 2009, Maltz set the auction terms, which were as follows: "Peconic Bay would be sold as-is, where-is, and with all faults, without any representations or warranties"; the winning bidder must repay the debt in full or assume the debt with the consent of the bank lender; and Gatz "reserved the right to cancel the auction at any time before bidding."[8] Maltz did not contact a bank to propose that prepackaged financing be offered to qualified bidders.

In 2009, Auriga brought a Court of Chancery action against Gatz. Auriga then moved to enjoin the Auction from taking place, but the court denied the injunction

---

5. *Id.* at 869 (emphasis added).

6. Although Galvin did eventually learn of the auction, he decided not to bid, in part because of the auction terms.

7. *Auriga,* 40 A.3d at 871 & n. 146.

8. *Id.* at 872 (internal quotations omitted).

motion.[9] Thereafter, Gatz reengaged appraiser Hirsh to opine on the advisability of proceeding with the auction. Hirsh opined that an auction would be quick and efficient, but he did not express any view on the fairness of the auction terms or of the pre-auction marketing process.

On August 18, 2009, the day of the auction, Maltz informed Gatz that he (Gatz) would be the only bidder. Gatz then proceeded to bid and then to purchase Peconic Bay for $50,000 cash plus assumption of the LLC's debt. The minority members collectively received $20,985. Maltz received $80,000 for his services. At trial Gatz admitted that "had there been another bidder at the Auction, he 'might have bid higher' than $50,000." [10]

In 2010, Auriga and the remaining LLC minority members brought this Court of Chancery action for money damages. After a trial, the court ruled in favor of Auriga, holding that Gatz had breached "both his contractual and fiduciary duties" to Peconic Bay's minority members.[11] The court awarded damages of $776,515 calculated as of January 1, 2008, plus prejudgment interest at the statutory rate, compounded monthly.[12] The court also awarded the minority members one half of their requested attorneys' fees and costs.[13] This appeal by Gatz followed.

On July 20, 2012, Gatz Properties filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Eastern District of New York. On September 12, 2012, the Bankruptcy Court granted, among other things, a motion for relief from the automatic stay, thereby enabling this Court to proceed with the appeal.

## II. STANDARD OF REVIEW

■ This case raises issues of contract interpretation that we review *de novo*.[14] This Court will uphold the trial court's factual findings unless they are clearly erroneous,[15] and will review damage awards and attorneys' fee awards for abuse of discretion.[16] We do "not substitute our own notions of what is right for those of the trial judge if that judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness." [17]

## III. ANALYSIS

### A. Did Gatz Owe Fiduciary Duties To The Other Members Of Peconic Bay?

■ The pivotal legal issue presented on this appeal is whether Gatz owed contractually-agreed-to fiduciary duties to Peconic Bay and its minority investors. Resolving that issue requires us to interpret Section 15 of the LLC Agreement, which both sides agree is controlling. Section 15 pertinently provides that:

Neither the Manager nor any other Member shall be entitled to cause the Company to enter into any amendment

---

9. *Auriga Capital Corp. v. Gatz Props., LLC*, C.A. No. 4390, at 85–86 (Del.Ch. Sept. 18, 2009).

10. *Auriga*, 40 A.3d at 872.

11. *Id.* at 843.

12. *Id.* at 880.

13. *Id.* at 882.

14. *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 170 (Del.2002) (citing *Schock v. Nash*, 732 A.2d 217, 224 (Del.1999)).

15. *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 491 (Del.2000).

16. *William Penn Partnership v. Saliba*, 13 A.3d 749, 758 (Del.2011).

17. *Id.*

of any of the Initial Affiliate Agreements which would increase the amounts paid by the Company pursuant thereto, or enter into any additional agreements with affiliates on terms and conditions which·are less favorable to the Company than the terms and conditions of similar agreements which could then be entered into with arms-length third parties, without the consent of a majority of the non-affiliated Members (such majority to be deemed to be the holders of 66–2/3% of all Interests which are not held by affiliates of the person or entity that would be a party to the proposed agreement).

The Court of Chancery determined that Section 15 imposed fiduciary duties in transactions between the LLC and affiliated persons. We agree. To impose fiduciary standards of conduct as a contractual matter, there is no requirement in Delaware that an LLC agreement use magic words, such as "entire fairness" or "fiduciary duties." Indeed, Section 15 nowhere expressly uses either of those terms. Even so, we construe its operative language [18] as an explicit contractual assumption by the contracting parties of an obligation subjecting the manager and other members to obtain a fair price for the LLC in transactions between the LLC and affiliated persons. Viewed functionally, the quoted language is the contractual equivalent of the entire fairness equitable standard of conduct and judicial review.[19]

We conclude that Section 15 of the LLC Agreement, by its plain language, contractually adopts the fiduciary duty standard of entire fairness, and the "fair price" obligation which inheres in that standard. Section 15 imposes that standard in cases where an LLC manager causes the LLC to engage in a conflicted transaction with an affiliate without the approval of a majority of the minority members. There having been no majority-of-the-minority approving vote in this case, the burden of establishing the fairness of the transaction fell upon Gatz. That burden Gatz could easily have avoided. If (counterfactually) Gatz had conditioned the transaction upon the approval of an informed majority of the nonaffiliated members, the sale of Peconic Bay would not have been subject to, or reviewed under, the contracted-for entire fairness standard.[20]

Gatz's admissions in the pleadings and during his cross examination at trial con-

---

**18.** The operative language of Section 15 is "on terms and conditions which are less favorable to the Company than the terms and conditions of similar agreements which could then be entered into with arms-length third parties, without the consent of a majority of the non-affiliated Members".

**19.** We previously have reached a similar result in the partnership context. *See Gotham Partners, supra,* 817 A.2d at 171. In *Gotham,* we affirmed the Court of Chancery's finding, which the parties did not contest, that the Partnership Agreement imposed entire fairness obligations. Section 7.05 of that Agreement permitted self-dealing transactions, "provided that the terms of any such transaction are substantially equivalent to terms obtainable by the Partnership from a comparable unaffiliated third party," reflecting the fair price prong. Section 7.10, which required an independent audit committee to review and approve the self-dealing transactions, reflected the fair dealing prong. *Id.* The LLC Agreement language employed in this case is substantially identical. Section 15 explicitly mandates a fair price analysis, but offers as a safe harbor a majority-of-the-minority vote. We interpret that contractual obligation here, as we did in *Gotham,* as the contracted-for functional equivalent of entire fairness.

**20.** That result contrasts with the outcome that it would obtain in the traditional corporate law setting, where an informed majority-of-the-minority shareholder vote operates to shift the burden of proof on the issue of fairness. *Kahn v. Lynch Commc'n Sys., Inc.,* 638 A.2d 1110, 1117 (Del.1994).

firm our contractual interpretation. In his Answer to Auriga's First Amended Complaint, Gatz admitted four times that he owed "certain fiduciary duties."[21] In his Opening Pretrial Brief, Gatz argued that he had "fully complied with [his] fiduciary duties, the LLC Agreement and the implied covenant."[22] In his Answering Pretrial Brief, Gatz stated in a footnote that "[t]o be absolutely clear, [Gatz is] not arguing that the LLC Agreement waives all fiduciary duties."[23]

Equally if not more illuminating is Gatz's trial testimony during cross examination. When asked, "Would you agree Gatz Properties owed fiduciary duties to the members of Peconic Bay?", Gatz answered unequivocally "Yes."[24] When asked, "And you understood that you personally had a fiduciary duty to all members of Peconic Bay[,] right?", Gatz again answered unequivocally "Yes."[25] When asked, "So, in that capacity [as Peconic Bay's manager], you understood that you had a fiduciary duty to all the members of Peconic Bay?", Gatz again answered "Yes."[26]

We therefore uphold the Court of Chancery's determination that Gatz breached his contractually adopted fiduciary duties to the minority members of Peconic Bay. Although the trial court reached that conclusion after first having determined that Delaware's LLC statute imposed "default" fiduciary duties—a conclusion that we address elsewhere in this Opinion—we affirm the court's holding that Gatz was subject to fiduciary duties and that he breached them. We do that exclusively on contractual grounds, however.

■■ Entire fairness review normally encompasses two prongs, fair dealing and fair price.[27] "However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."[28] In this case, given the language of Section 15 which speaks only in terms of fair price, the Court of Chancery formally applied only the fair price prong. But, in doing so that court also properly considered the "fairness" of how Gatz dealt with the minority "because the extent to which the process leading to the self-dealing either replicated or deviated from the behavior one would expect in an arms-length deal bears importantly on the price determination."[29] The court further held that "in

---

21. App. to Ans. Br. B 44 ("Admitted only that Gatz Properties is Manager of PBG and owes certain fiduciary duties as a result thereof."); id. at B 45 ("Admitted that Gatz is the manager and an equity holder of Gatz Properties. It is also admitted that Gatz Properties is Manager of PBG and owes certain fiduciary duties as a result thereof."); id. at B 46 ("Admitted that Gatz Properties is [the] Manager of PBG and owes certain fiduciary duties as a result thereof."); id. ("Admitted that Gatz Properties knew it owed fiduciary duties.").

22. Id. at B 66.

23. Id. at B 93 n.4.

24. Id. at B 157.

25. Id.

26. Id. at B 164.

27. Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del.1983). Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." Id. Fair price "relates to the economic and financial considerations of the proposed" transaction. Id.

28. Id.

29. Auriga Capital Corp. v. Gatz Props., LLC, 40 A.3d 839, 857 (Del.Ch.2012) (citing Flight Options Int'l, Inc. v. Flight Options, LLC, 2005 WL 2335353, at *7 n. 32 (Del.Ch. Sept. 20, 2005)). Indeed, this Court has recognized that a fair process generally leads to a fair

order to take cover under the contractual safe harbor of Section 15, Gatz bears the burden to show that he paid a fair price to acquire Peconic Bay."[30] We agree.

The trial judge found facts, solidly grounded in the record, that firmly support his conclusion that Gatz breached his contracted-for duty to the LLC's minority members. Regarding price, the court found that "Peconic Bay was worth more than what Gatz paid."[31] Gatz argued, but failed to convince the court, that "the Property had no positive value...."[32] The court did not regard the absence of competing bids at the auction as persuasive evidence that the price Gatz paid to cash out the minority members was fair.[33] As the court found, "even as of the date of the Auction, the fundamentals of Peconic Bay were such as to make [the court] conclude that an offer above the debt would have been economically justifiable."[34] The Court of Chancery also properly relied on Auriga's expert witness's discounted cash flow analysis, which valued Peconic Bay at approximately $8.9 million.[35]

The court also found as fact that had "Gatz dealt with Galvin with integrity in 2007, it seems probable that Peconic Bay could have been sold in a way that generated to the Minority Members a full return of their invested capital ($725,000) plus a 10% aggregate return ($72,500)."[36] In reaching that result, the court relied on the fact that Gatz had rebuffed Galvin's interest in discussing a deal "well north of $6 million."[37] The court also found persuasive Galvin's explanation of why, under the circumstances, an over $6 million price was justifiable.[38]

As for fair dealing, the Court of Chancery did not "view the Auction process as generating a price indicative of what Peconic Bay would fetch in a true arms-length negotiation."[39] Indeed, the court found, the Auction was a "sham," "the culmination of Gatz's bad faith efforts to squeeze out the Minority Members."[40] The court concluded that "[b]y failing for years to cause Peconic Bay to explore its market alternatives, Gatz manufactured a situation of distress to allow himself to purchase Peconic Bay at a fire sale price at a distress sale."[41]

These conclusions flow persuasively from the evidence of record. Gatz's decision to auction off Peconic Bay as a distressed property—as opposed to engaging

price. *See Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1244 (Del.2012).

30. *Auriga*, 40 A.3d at 857–58.

31. *Auriga*, 40 A.3d at 875.

32. *Id.* at 876.

33. "The fact that Carr would not stake his credibility with investors on the line by funding a full purchase of Peconic Bay after having had the investors he procured receive no return of capital for ten years is not one that can be given much weight." *Id.* "Furthermore, the fact that Galvin of RDC did not bid was understandable based on the unfair Auction rules and the prior treatment he had received at Gatz's hands." *Id.*

34. *Id.*

35. *Id.* at 876–77.

36. *Id.* at 877–78.

37. *Id.* at 865.

38. *Id.* at 878.

39. *Id.* at 874–75 (citing *Flight Options Int'l, Inc. v. Flight Options, LLC*, 2005 WL 2335353, at *8 (Del.Ch. Sept. 20, 2005); *Neal v. Ala. By–Prods. Corp.*, 1990 WL 109243, at *11 (Del.Ch. Aug. 1, 1990), *aff'd*, 588 A.2d 255 (Del.1991)).

40. *Id.* at 873.

41. *Id.*

a broker experienced in the golf course industry to sell the company or its prime assets in an orderly way—was wholly unnecessary.[42] Peconic Bay's cash reserves would have afforded Gatz ample time to structure a sale of the property consistent with his contracted-for fiduciary obligation.[43] The court found that "even in the context of an auction approach, the indifference and unprofessionalism of the marketing effort [was] patent." [44] That finding rested on, among other things: (i) the absence of any direct outreach to industry players, (ii) the fact that Gatz failed to inform Maltz of RDC's expressions of interest, (iii) the rushed time frame of the marketing, and (iv) the auction terms themselves.[45] The Court of Chancery properly concluded "that the Auction was not a process that anyone acting with minimal competency and in good faith would have used to obtain fair value for Peconic Bay." [46]

We are satisfied that Gatz failed to carry his burden of proving that he discharged his contracted-for entire fairness obligation. Accordingly, we affirm that court's determination of liability solely on contractual grounds.

## B. Does Section 16 Of The LLC Agreement Exculpate Gatz?

 Although the trial court's adjudication subjects Gatz to liability under Section 15 of the LLC Agreement, another provision, Section 16, permits both exculpation and indemnification of Peconic Bay's manager in specified circumstances. Gatz, however, did not cause those circumstances to come about. Having failed to

satisfy the criteria of Section 16, Gatz was not eligible for exculpation or indemnification, and the Court of Chancery properly so held.

Section 16 of the LLC Agreement pertinently provides:

> No Covered Person [defined to include, among others, the members, manager, and officers and the employees] shall be liable to the Company, [or] any other Covered Person or any other person or entity who has an interest in the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith in connection with the formation of the Company or on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence, willful misconduct or willful misrepresentation.[47]

Gatz was not entitled to exculpation because the Court of Chancery properly found that he had acted in bad faith and had made willful misrepresentations in the course of breaching his contracted-for fiduciary duty. Consequently, Section 16 of the LLC Agreement provides no safe harbor. We highlight the most egregious instances below.

This Court and the Court of Chancery have defined "bad faith" in the corporate fiduciary duty of loyalty context as (among other things) a failure "to act in the face of a known duty to act," which demonstrates

---

**42.** *Id.*

**43.** *Id.*

**44.** *Id.* at 874.

**45.** *Id.*

**46.** *Id.*

**47.** *Id.* at 858. The indemnification provisions are identical for our purposes.

a "conscious disregard" of one's duties.[48] Here, the Court of Chancery made factual findings, rooted solidly in the record, that firmly support its conclusion that in breaching his contractual fiduciary obligation, Gatz acted in bad faith. The court found that "Gatz knew, by at latest 2005, that American Golf was very likely to terminate the Sublease in 2010," [49] and that there was no "credible evidence suggesting that Gatz engaged in a serious or thoughtful effort to look for a replacement operator." [50] The court described Gatz's actions as "consistent with those of someone who was hoping that that [sic] Peconic Bay would simply revert back to his family's ownership once Peconic Bay's primary source of revenue ran dry, without regard for the interests of the Minority Members." [51] As the record establishes, in 2007, Gatz refused to provide basic due diligence to RDC, a credible buyer.[52] Gatz also criticized RDC's financial projections as being too optimistic, and refused in any way to engage with RDC even though Gatz knew that American Golf was likely to terminate the lease payments in 2010.[53]

Likewise, the factual findings support the court's conclusion that Gatz conducted the Auction in bad faith. Gatz decided to pursue an auction process on distressed sale terms, rather than a broker-led process based on a fully developed analysis of strategic alternatives.[54] That conduct was particularly egregious, because Peconic Bay's cash cushion would have allowed the LLC to continue "to pay the bills for three years" while searching for a buyer.[55] No less egregious was Gatz's failure to tell the auctioneer about RDC's recent interest in acquiring Peconic Bay and Galvin's willingness to pay "north of $6 million." [56] We agree with the trial court that "the Auction was not a process anyone acting with minimal competency and in good faith would have used to obtain fair value for Peconic Bay." [57]

Further, that court correctly found that Gatz's offer to Peconic Bay's minority members in 2008 "contained incomplete and misleading information about the RDC negotiations." [58] Gatz "intentionally [misled] the Minority Members when accurate information concerning third-party offers would have been material to their decision whether to accept Gatz's own offer . . . ." [59]:

> Specifically, Gatz failed to inform the Minority Members that Galvin had told Gatz that RDC "may have an interest north of $6 million," and that [Galvin] "may be able to get more aggressive" than his last bid of $4.15 million. Gatz also failed to inform the Minority Members that Gatz never followed up on Galvin's invitations to negotiate or that RDC had bid without any benefit of due diligence. Rather, Gatz conveyed the misleading impression that RDC—a rep-

48. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del.2006) (citing *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del.2006)).

49. *Auriga*, 40 A.3d at 861.

50. *Id.*

51. *Id.* at 862.

52. *Id.* at 864.

53. *Id.* at 864–65. The court found Gatz's explanations for his behavior to be "weak." *Id.* at 866.

54. *Id.* at 873.

55. *Id.*

56. *Id.* at 868–69.

57. *Id.* at 874.

58. *Id.* at 868.

59. *Id.*

utable third-party buyer—was only will-ing to pay $4.15 million for Peconic Bay's assets so that Gatz's own offer would appear more attractive.[60]

Those findings support the court's deter-mination that Gatz acted in bad faith and made willful misrepresentations. We therefore uphold the trial court's finding that Section 16 of the LLC Agreement does not immunize Gatz from liability for his conduct.

## C. Unnecessary Construction Of LLC Statute To Provide Default Fiducia-ry Duties

██ At this point, we pause to comment on one issue that the trial court should not have reached or decided. We refer to the court's pronouncement that the Delaware Limited Liability Company Act imposes "default" fiduciary duties upon LLC man-agers and controllers unless the parties to the LLC Agreement contract that such duties shall not apply. Where, as here, the dispute over whether fiduciary stan-dards apply could be decided solely by reference to the LLC Agreement, it was improvident and unnecessary for the trial court to reach out and decide, *sua sponte,* the default fiduciary duty issue as a matter of statutory construction. The trial court did so despite expressly acknowledging that the existence of fiduciary duties under the LLC Agreement was "no longer con-tested by the parties." [61] For the reasons next discussed, that court's statutory pro-nouncements must be regarded as dictum without any precedential value.[62]

First, the Peconic Bay LLC Agreement explicitly and specifically addressed the "fiduciary duty issue" in Section 15, which controls this dispute. Second, no litigant asked the Court of Chancery or this Court to decide the default fiduciary duty issue as a matter of statutory law. In these circumstances we decline to express any view regarding whether default fiduciary duties apply as a matter of statutory con-struction. The Court of Chancery likewise should have so refrained.

Third, the trial court's stated reason for venturing into statutory territory creates additional cause for concern. The trial court opinion identifies "two issues that would arise if the equitable background explicitly contained in the statute were to be judicially excised now." [63] The opinion suggests that "a judicial eradication of the explicit equity overlay in the LLC Act could tend to erode our state's credibility with investors in Delaware entities." [64] Such statements might be interpreted to suggest (hubristically) that once the Court of Chancery has decided an issue, and because practitioners rely on that court's decisions, this Court should not judicially "excise" the Court of Chancery's statutory interpretation, even if incorrect.[65] That was the interpretation gleaned by Auriga's counsel. During oral argument before this Court, counsel understood the trial court opinion to mean that "because the Court of Chancery has repeatedly decided an issue one way, ... and practitioners have ac-cepted it, that this Court, when it finally gets its hands on the issue, somehow ought to be constrained because people have

60. *Id.* (internal footnote omitted).

61. *Auriga,* 40 A.3d at 856, n. 67.

62. We feel compelled to address this dictum "because it could be misinterpreted in future cases as a correct rule of law," when in fact the question remains open. *Gotham Partners,*

*L.P. v. Hallwood Realty Partners, L.P.,* 817 A.2d 160, 167 (Del.2002).

63. *Id.* at 853.

64. *Id.* at 854.

65. *Id.* at 853–56.

been conforming their conduct to" comply with the Court of Chancery's decisions.[66] It is axiomatic, and we recognize, that once a trial judge decides an issue, other trial judges on that court are entitled to rely on that decision as *stare decisis*.[67] Needless to say, as an appellate tribunal and the court of last resort in this State, we are not so constrained.[68]

Fourth, the merits of the issue whether the LLC statute does—or does not—impose default fiduciary duties is one about which reasonable minds could differ. Indeed, reasonable minds arguably could conclude that the statute—which begins with the phrase, "[t]o *the extent that*, at law or in equity, a member or manager or other person has duties (including fiduciary duties)"[69]—is consciously ambiguous. That possibility suggests that the "organs of the Bar" (to use the trial court's phrase) may be well advised to consider urging the General Assembly to resolve any statutory ambiguity on this issue.[70]

**66.** Transcript of Oral Argument at 40:38, *Gatz Props., LLC v. Auriga Capital Corp.*, No. 148, 2012 (Del. Sept. 19, 2012), *available at* http://courts.delaware.gov/supreme/audioargs.stm.

**67.** *See Best v. State*, 328 A.2d 141, 143 (Del. 1974) ("No appeal was taken in the Moore case[, a Superior Court case]. We therefore conclude that such [a] ruling constitutes for the Superior Court, at least, a precedent in this State.... The decision in Moore is not attacked by appellant and we express no opinion thereon. Accordingly, there being no other Delaware decision on the subject, the trial judge in the instant case was entitled to rely upon the ruling of the Superior Court in Moore under the principle of stare decisis.").

**68.** *See Santow v. Ullman*, 166 A.2d 135, 140 (Del.1960) ("On the other hand, in *American Insurance Co. v. Iaconi* [89 A.2d 141 (Del. 1952)] ..., we declined to apply [*stare decisis*], and disapproved a decision of the Superior Court that had stood unchallenged for many years. We pointed out that *stare decisis* has little application to a case in which an appellate court is examining a decision of a lower court.") (citation omitted).

**69.** 6 *Del. C.* § 18–1101(c) (emphasis added).

**70.** The trial court's statutory view may have been influenced by its misreading of two cases, *Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370 (Del.Ch. Mar. 13, 2000) and *William Penn Partnership v. Saliba*, 13 A.3d 749 (Del.2011). The trial judge regarded *Cantor Fitzgerald* as supportive of the proposition that the "manager of an LLC has more than an arms-length, contractual relationship with the members of the LLC." *Auriga*, 40 A.3d at 850–51, 851 n. 38. To the extent that reading interprets *Cantor Fitzgerald* as recognizing de-

fault statutory fiduciary duties, it is inaccurate. In *Cantor Fitzgerald*, the Court of Chancery found that, based on specific provisions in the partnership agreement, the limited partners could not "credibly argue that they [had] not knowingly and willingly accepted the obligation of a fiduciary duty of loyalty," and that it made sense to conclude that the parties intentionally bargained for that provision in light of the partnership's unique business. *Cantor Fitzgerald*, 2000 WL 307370, at *22. The *Cantor Fitzgerald* court clarified that the duty of loyalty expressly adopted in the partnership agreement required "no dependency upon a default concept to a narrow definition derived from corporate common law," and that in interpreting the partnership agreement, the "scope of the duties owed by the parties must be determined by reference to the nature of *this particular business enterprise.*" *Id.* (emphasis added, citation omitted).

The trial court also interpreted our decision in *Saliba* as holding that traditional fiduciary duties exist unless the contracting parties expressly modify or eliminate them in their operating agreement. *Auriga*, 40 A.3d at 854, 855 n. 65 (citing *Saliba*, 13 A.3d at 756). That misreads *Saliba's* holding. In *Saliba* our task was to interpret the intent of the parties as expressed in their operating agreement. There, the parties agreed that under the operating agreement, fiduciary duties applied. *Saliba*, 13 A.3d at 756 ("[T]he parties here agree that the Lingos [as managers] owe fiduciary duties of loyalty and care to the members of Del Bay."). In that circumstance, we do not look behind their in-court representations. *See Stroud v. Grace*, 606 A.2d 75, 87 n. 2 (Del.1992) ("Plaintiffs do not specifically contest this aspect of the Vice

Fifth, and finally, the court's excursus on this issue strayed beyond the proper purview and function of a judicial opinion. "Delaware law requires that a justiciable controversy exist before a court can adjudicate properly a dispute brought before it."[71] We remind Delaware judges that the obligation to write judicial opinions on the issues presented is not a license to use those opinions as a platform from which to propagate their individual world views on issues not presented.[72] A judge's duty is to resolve the issues that the parties present in a clear and concise manner. To the extent Delaware judges wish to stray be-

yond those issues and, without making any definitive pronouncements, ruminate on what the proper direction of Delaware law should be, there are appropriate platforms, such as law review articles, the classroom, continuing legal education presentations, and keynote speeches.[73] That said, we next turn to the issue of damages.

## D. Damages

 Having found that the defendants had breached a contracted-for fiduciary duty arising from equity, and that the LLC Agreement did not dictate otherwise, the Court of Chancery awarded equitable damages as a remedy.[74] Damages awards

Chancellor's ruling on appeal and effectively waive that claim."). Similarly, where, as here, the LLC Agreement expressly imposes a contractual obligation of entire fairness, it is unnecessary to look beyond the contract language to determine whether default fiduciary duties exist as a matter of statutory law.

**71.** *Crescent/Mach 1 Partners L.P. v. Dr Pepper Bottling Co. of Texas*, 962 A.2d 205, 208 (Del. 2008) (quoting *Warren v. Moore*, 1994 WL 374333, at *2 (Del.Ch. July 6, 1994)).

**72.** *See Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1263 (Del.2012) (Berger, J., concurring and dissenting) (arguing that "the trial court did not apply" the law, but rather "its own world views on incentives, bankers' compensation, and envy").

**73.** Rule 3.1 of the Delaware Judges' Code of Judicial Conduct (2008) provides:
 A judge, subject to the proper performance of judicial duties, may engage in the following law-related activities if in doing so the judge does not cause reasonable doubt on the capacity to decide impartially, independently and with integrity any issue that may come before the judge:
 (A) A judge may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice (including projects directed to the drafting of legislation).
 *See* Myron T. Steele & J.W. Verret, *Delaware's Guidance: Ensuring Equity for the Modern Witenagemot*, 2 Va. L. & Bus. Rev. 189 (2007) (discussing the role of extrajudicial activities

in guiding Delaware law); *see also* Lawrence A. Hamermesh, *The Policy Foundations of Delaware Corporate Law*, 106 Colum. L.Rev. 1749, 1759–62, 1788 (2006) (describing how the members of the Delaware Court of Chancery and Delaware Supreme Court develop corporate law outside of the courtroom as well as cataloguing appearances by Delaware judges at public forums on corporate law).

**74.** This case echoes our ruling in *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*:

 The Partnership Agreement provides for contractual fiduciary duties of entire fairness. Although the contract could have limited the damage remedy for breach of these duties to contract damages, it did not do so. The Court of Chancery is not precluded from awarding equitable relief as provided by the entire fairness standard where, as here, the general partner breached its contractually created fiduciary duty to meet the entire fairness standard and the partnership agreement is silent regarding damages. The Court of Chancery in this case may award equitable relief as provided by the *entire fairness standard and is not* limited to contract damages for two reasons: (1) this case involves a breach of the duty of loyalty and such a breach permits broad, discretionary, and equitable remedies; and (2) courts will not construe a contract as taking away other forms of appropriate relief, including equitable relief, unless the contract explicitly provides for an exclusive remedy.

are reviewed under an abuse of discretion standard.[75] As earlier stated, we do "not substitute our own notions of what is right for those of the trial judge if that judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness." [76]

Conscience and reason appropriately circumscribed the trial court's award of damages in this case. The law requires the trial judge to weigh the evidence, including the credibility of live witness testimony.[77] The trial judge very clearly detailed his reasons, based on facts of record, for "not reach[ing] the same conclusion [as] Gatz . . . about whether he should suffer a damages award." [78] Gatz failed to convince the Court of Chancery "that the Property had no positive value." [79] That court found that, "even as of the date of the Auction, the fundamentals of Peconic Bay were such as to make [the court] conclude that an offer above the debt would have been economically justifiable." [80] The court relied in part upon Auriga's damages expert, who presented a discounted cash flow analysis that valued Peconic Bay at $8.9 million as of the Auction date.[81] That analysis, although optimistic, was found reasonable.[82]

The trial court determined that if Gatz had engaged with Galvin in 2007, as Gatz's contracted-for entire fairness duty required, Peconic Bay could probably have been sold at a price that returned to the minority investors both their initial capital ($725,000) plus a 10% aggregate return ($72,500).[83] The court found Galvin's testimony sufficiently credible to support a "fair price" above $6 million. Auriga's damages expert's report also supports that finding. As the trial court aptly noted, although Gatz "had no duty to sell his interests," he did not have "a free license to mismanage Peconic Bay so as to deliver it to himself for an unfair price." [84]

The Court of Chancery arrived at a damage award of $776,515, which represented a full return of the minority members' capital contributions plus a 10% aggregate return, less the $20,985 the minority members received at the Auction. That award is slightly less than the amount a sale in 2007 for $6.5 million would have yielded.[85] The court noted that its damages award was modest and that "the record could support a higher one." [86] The damages award was based on conscience and reason, and we uphold it.

### E. Attorneys' Fees

 Gatz's final claim of error attacks the trial court's award of attorneys' fees. We review an award of attorneys' fees for

---

817 A.2d 160, 175 (Del.2002).

**75.** *William Penn P'ship v. Saliba,* 13 A.3d 749, 758 (Del.2011).

**76.** *Id.*

**77.** *Hudak v. Procek,* 806 A.2d 140, 150 (Del. 2002) (citations omitted) (We "regularly defer[] to the unique opportunity of the factfinder, whether judge or jury, to evaluate the live witnesses, to evaluate their demeanor and credibility and to resolve conflicts in the testimony.").

**78.** *Auriga,* 40 A.3d at 876.

**79.** *Id.*

**80.** *Id.*

**81.** *Id.*

**82.** *Id.* at 877.

**83.** *Id.* at 877–78.

**84.** *Id.* at 878 (citations omitted).

**85.** *Id.* at 879.

**86.** *Id.*

abuse of discretion.[87] The Court of Chancery, under its equitable powers, has latitude to shift attorneys' fees, and properly did so here. Although this case involved a legal dispute over a contractual provision of an LLC Agreement, even at law a court has inherent authority to shift fees where necessary to control the court's own process.[88]

 "Under the American Rule, absent express statutory language to the contrary, each party is normally obliged to pay only his or her own attorneys' fees."[89] The American Rule applies in Delaware.[90] Our courts have, however, recognized bad faith litigation conduct as a valid exception to that rule.[91] "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[92]

In this case, the Court of Chancery made specific findings that detailed Gatz's bad faith conduct throughout the course of the trial. Even so, the court awarded plaintiffs only one-half of their reasonable attorneys' fees and costs because of Auriga's own "less than ideal" litigation efforts.[93] The record amply supports that result. Particularly troubling are the findings that Gatz's counsel left "Gatz himself the primary role of collecting responsive documents," and that Gatz "delete[d] relevant documents while litigation was either pending or highly likely."[94] In addition, "Gatz and his counsel simply splattered the record with a series of legally and factually implausible assertions."[95] The court did not abuse its discretion in awarding attorneys' fees. We affirm that award.[96]

## IV. CONCLUSION

For the foregoing reasons, the judgment of the Court of Chancery is AFFIRMED.

**87.** *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1262 (Del.2012) (citing *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142, 149 (Del.1980)).

**88.** *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1090 n. 14 (Del.2006) ("[I]n this case the appellants' request for attorneys' fees under the bad faith exception to the American Rule would require the Superior Court to exercise its inherent equitable authority to control its own process.") (internal quotations omitted).

**89.** *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 545 (Del.1998) (citing John F. Vargo, *The American Rule on Attorney Fee Allocation: The Injured Person's Access to Justice*, 42 AM. U.L.REV. 1567 (1993)).

**90.** *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 227 (Del.2005) (citing *Goodrich v. E.F. Hutton Grp., Inc.*, 681 A.2d 1039, 1043 (Del.1996)).

**91.** *Johnston*, 720 A.2d at 546 (citations omitted).

**92.** *Id.* (internal footnotes and citations omitted).

**93.** *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 881–82 (Del.Ch.2012).

**94.** *Id.* at 881 (internal footnote and citations omitted).

**95.** *Id.*

**96.** In his briefs and at oral argument, Auriga's counsel made an informal application for an award of attorneys' fees for this appeal. Although we have authority under Supreme Court Rule 20(f) to award attorneys' fees in the case of a frivolous appeal, we will not consider an informal request in the absence of a formal motion made and presented in accordance with the Supreme Court Rules. Supr. Ct. R. 20(f).