# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| TRASCENT MANAGEMENT CONSULTING, LLC, | ) ) ) |
| Plaintiff/Counterclaim Defendant, | ) ) |
| v. | ) C.A. No. 10915-VCMR ) |
| GEORGE BOURI, | ) ) |
| Defendant/Counterclaim Plaintiff. | ) ) |

## MEMORANDUM OPINION
Date Submitted: August 7, 2018
Date Decided: September 10, 2018.

Michael W. Arrington and Michael W. Teichman, PARKOWSKI, GUERKE & SWAYZE, P.A., Wilmington, Delaware; Michael S. Gardner, Eric P. Haas, and Jeremy R. Wilson, GARDNER HAAS PLLC, Dallas, Texas; *Attorneys for Plaintiff and Counterclaim Defendant.*

Todd C. Schiltz and Ryan T. Costa, DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Damian Christian Shammas and Kristen Jasket Piper, LAW OFFICES OF DAMIAN CHRISTIAN, Morristown, New Jersey; *Attorneys for Defendant and Counterclaim Plaintiff.*

**MONTGOMERY-REEVES, Vice Chancellor.**

In 2011, a real estate management consultant started looking for investors or a partner for his consulting firm. He wanted to grow the business globally, but he spent too much time working abroad to focus on the United States business. He reached out to a business acquaintance to see if he was interested in investing or becoming a partner. The business acquaintance, the defendant in this case, was not interested in giving the consultant cash, but he persuaded the consultant to set up a new entity, pour the consultant's clients, reputation, and goodwill into that new entity, and make the defendant a manager and equity owner of the new entity. The defendant persuaded the consultant to take these steps by presenting himself as an attractive partner with immense business success and personal wealth. Little did the consultant know that the defendant's representations were false. The defendant was struggling financially and had been terminated from his previous job because his superiors had lost confidence in his business judgment after complaints regarding his management style and workplace behavior.

Truth is never far from the spotlight in legal proceedings, but this is a case where questions about truth take a prominent role. The plaintiff alleges that the defendant fraudulently induced the consultant to form a new limited liability company and grant the defendant a significant portion of the equity in the new company by representing that he had voluntarily resigned from his last position, when he actually had been terminated, and that he was a man of significant means,

when he actually was struggling financially. The plaintiff also alleges that the defendant's employment agreement with it was a product of the same fraud. The plaintiff seeks rescission of the employment agreement procured by fraud; a declaration that the limited liability company agreement is unenforceable by the defendant; and attorneys' fees and costs incurred in this litigation. In the alternative, the plaintiff requests a declaration that the defendant was terminated from the company for cause and damages related to the defendant's breaches of contract and fiduciary duty. I find that the defendant not only fraudulently induced the formation of the limited liability company and his employment agreement but also, unable to let go of the fraud, made numerous false statements during this litigation. Thus, I rescind the employment agreement, declare the limited liability company agreement unenforceable by the defendant, and award some, but not all, attorneys' fees and costs as a sanction for bad faith litigation conduct.

## I.  BACKGROUND

Below are my findings of fact based on the parties' stipulations, trial exhibits, and the testimony of live witnesses during a five-day trial.[1]

---

[1]  Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker. Joint Trial Exhibits are cited as "JX #," and facts drawn from the parties' Joint Pretrial Stipulation and Order are cited as "PTO #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs. After being identified initially, individuals are referenced herein by their surnames without honorifics or regard to formal titles such as "Doctor." No disrespect is intended.

## A. Parties and Relevant Non-Parties

Trascent Management Consulting, LLC ("Trascent") is a Delaware limited liability company ("LLC").[2] As of January 1, 2014, there were three members and holders of Class A Units of Trascent: Rakesh Kishan, George Bouri, and Itay Fastovsky.[3]

Kishan manages the European affairs of Trascent and has served as a member of the board of managers of Trascent (the "Board") since 2014.[4] He was the sole member of the Board from April 8, 2015, until he reinstated Fastovsky several days later.[5] He owns a majority of Trascent's Class A Units.[6]

Bouri was Managing Principle of the Americas and also in charge of finance, human resources ("HR"), information technology ("IT"), and operations for Trascent from January 1, 2014, to April 8, 2015.[7] He was also a member of the

---

[2]    JX 56, at 1.

[3]    *Id.* at Schedule I.

[4]    Tr. 43 (Kishan); PTO ¶ II.16.

[5]    PTO ¶ II.55; Tr. 1080 (Fastovsky).

[6]    PTO ¶ II.18.

[7]    *Id.* ¶¶ II.23, II.24, II.55, II.58.

3

Board during that time.[8] He owned forty-three percent of Trascent's Class A Units until his separation from Trascent.[9]

Fastovsky manages the Asian affairs of Trascent.[10] He was also a member of the Board from January 1, 2014, to April 8, 2015.[11] Several days after April 8, 2015, Kishan reinstated Fastovsky to the Board.[12] He owns eight percent of Trascent's Class A Units.[13]

Neha Patel Kishan is Kishan's wife.[14] She served as Director of Finance for UMS Advisory, Inc. ("UMS Advisory"), Trascent's predecessor entity,[15] and Director of Finance for Trascent until May 2014.[16]

---

[8]     *Id.* ¶¶ II.16, II.55, II.58.

[9]     *Id.* ¶¶ II.22; JX 56, at 3, 27.

[10]    Tr. 43 (Kishan).

[11]    PTO ¶¶ II.16, II.55.

[12]    Tr. 1080 (Fastovsky).

[13]    PTO ¶¶ II.17, II.20, II.21; Tr. 1080 (Fastovsky).

[14]    PTO ¶ II.10.

[15]    *Id.* ¶ II.33.

[16]    *Id.* ¶¶ II.10, II.13, II.33, II.34.

**B.    Facts**

The astute reader may find the below facts confusing at times.  I remind the reader that this is a quintessential case of "he-said/he-said," and the below recitation of facts includes the misrepresentations made by one party to the other.  I endeavor to show the actual series of events as best the record will allow.

**1.    Kishan and UMS Advisory**

In 2000, Kishan began working for a real estate consulting business that ultimately became UMS Advisory.[17]  Kishan managed UMS Advisory and, in 2006, became the sole owner.[18]  UMS Advisory "provided management consulting services to top Fortune 200 companies . . . around real estate, which is buying and selling property, managing properties and portfolios of corporations, large global corporations, as well as facilities management, which is the operations of those portfolios."[19]

UMS Advisory performed well financially.[20]  It made a profit each year and paid bonuses every year except for 2008.[21]  It also expanded globally with offices in

---

[17]    *Id.* ¶ II.1.

[18]    *Id.*

[19]    Tr. 7 (Kishan).

[20]    *Id.*

[21]    Tr. 7-8 (Kishan).

Singapore and Switzerland.[22] Kishan moved to Switzerland at the end of 2010 to run the office there and "lead a significant project with Novartis."[23] Kishan's "presence in Switzerland and residency in Switzerland, which was then sponsored by Novartis, required [him] to spend significant attention in the European market and [he] needed somebody [he] could trust to then manage the operations in the [United States] and [he] started to entertain bringing in a partner."[24] By mid-2011, Kishan thought of Bouri, whom he had met when Bouri was an executive at Time Warner, as a potential candidate to become his partner in the United States.[25]

## 2. Bouri's departure from Time Warner

Meanwhile, on May 2, 2011, Bouri returned from a vacation to his job as Senior Vice President ("SVP"), Real Estate and Facilities Management at Time Warner.[26] He was informed upon his return that people in his department had made complaints against him and that Time Warner's HR department had launched an investigation.[27] He was told he could not "be in the building or anywhere near the

---

[22]    Tr. 8 (Kishan).

[23]    Tr. 9 (Kishan).

[24]    *Id.*

[25]    Tr. 10-11 (Kishan).

[26]    Tr. 613-14 (Bouri).

[27]    Tr. 613-15 (Bouri).

6

employees so that there was no perception of . . . favoritism towards [him] the executive."[28] That was the last time he "was at Time Warner as an employee."[29]

The investigation proceeded, and three days later Bouri spoke by telephone with one of Time Warner's attorneys regarding complaints about his management style and behavior.[30] The attorney had compiled a list of complaints about Bouri's management style, including that he was "unreasonable, blaming others for his mistakes, aggressive, disrespectful, bullying, 'act[ing with a] regal air [and] entitlement,' bad mouthing other [Time Warner] leaders and team members, [displaying] erratic behaviors [and] mood swings, [and making] consistent comments about his role/title: [like] 'I'm a f[***]ing SVP.'"[31] The attorney also had a list of complaints about sexual comments and conduct:

> [T]alk about sex all the time, graphic detail, open marriage [with] wife—girlfriends, try anything once, oral sex, the box, look good have to fire you to date you, date your sister, are you gay, going down on people, hand on thigh with discussion about 'keeping' thai [sic] girlfriends, full body bear hugs, hands on shoulder/thighs, hugs, kisses on lips (closed mouth), kisses on lips open mouth, hugs—full

---

[28]     Tr. 613-14 (Bouri).

[29]     Tr. 614 (Bouri).

[30]     JX 306, at TW0050; Tr. 554-56 (Bouri).

[31]     JX 306, at TW0051.

7

body uncomfortable to watch, has seen kisses with [redacted].[32]

The attorney took notes on Bouri's responses to the allegations during their meeting. She wrote the following statements:

> Denied open relationship, talking about sex/initiating, never asked about sex. [sic] orientation, never talked about sex <u>ever</u> with anyone at work, doesn't like to socialize, has wife 3 kids wants to get home, doesn't drink a lot only 1 drink, never mentioned about having girlfriends, denied ever having taken anyone to the box, never kissed anyone at work ever, never in a cab except previous [D]eloitte, doesn't lose his temper, is a Libra, so well-balanced.[33]

On May 6, 2011, Time Warner terminated Bouri without cause.[34] Bouri met, by telephone, with his manager and the CEO of Time Warner, John Martin, and a HR representative, Mark Henderson, about his termination.[35] There were talking points prepared for this meeting.[36] The talking points indicate that Martin reminded Bouri that Time Warner had "received complaints from [Bouri's] team . . . about [Bouri's] management and [his] behavior. A prompt and thorough review was

---

[32]      *Id.* at TW0051-52.

[33]      *Id.* at TW0052.

[34]      *Id.* at TW0010.

[35]      *Id.* at TW0001-03.

[36]      *Id.*

completed and [Martin was] briefed on the data gathered during the review."[37] The talking points also say that Bouri's "previous manager, [Martin,] and other Time Warner leaders . . . spent considerable time during the last year addressing areas of [Bouri's] performance that are not meeting the needs of [Time Warner]," and "[t]his feedback has included multiple occasions where [Bouri's supervisors] . . . addressed [Bouri's] failure to use sound business judgment on business matters as well as with [his] team."[38] Martin was to inform Bouri that he "no longer had confidence in [Bouri's] business judgment," and "it is in the best interest of [Time Warner] to make a change."[39] Henderson then reviewed the key points of the notice of termination, termination agreement, and release with Bouri.[40]

Bouri received the notice of termination dated May 6, 2011, which explained that he was being terminated without cause.[41] Bouri signed the termination agreement as revised, which also stated that he was being terminated without cause, on May 16, 2011.[42] Under the termination agreement, Bouri would continue to

---

[37]     *Id.* at TW0002-03.

[38]     *Id.* at TW0002.

[39]     *Id.*

[40]     *Id.* at TW0003.

[41]     *Id.* at TW0010.

[42]     *Id.* at TW0011.

9

receive his current base salary of $481,000 and a pro rata share of his annual bonus until the effective termination date of July 5, 2011.[43] The termination agreement shows that Time Warner and Bouri agreed that the average annual bonus amount was $360,825.07.[44] The termination agreement also shows that Bouri agreed to "resign as an **officer** of Time Warner Inc." as of May 6, 2011, and agreed "to sign the enclosed officer resignation letter to effectuate [his] removal from [Time Warner's] books as an officer."[45] The termination agreement goes on to say, "The officer resignation letter is not intended to alter the nature of your departure and, as stated below, your termination will for all purposes be considered a termination without cause."[46] Bouri signed the officer resignation letter on May 16, 2011.[47] On May 18, 2011, he signed a release stating that in exchange for the benefits he

---

[43]     *Id.*

[44]     *Id.* This agreed-to amount is seventy-five percent of Bouri's base salary under the Time Warner employment agreement, which is consistent with the seventy-five percent target bonus also in that agreement. *See id.* at TW0020.

[45]     *Id.* (emphasis added). In an email on May 10, 2011, Bouri states that he is "not able to sign the resignation letter in its present form. A 'resignation' is inconsistent with a 'termination without cause.' I would not want someone to state that I resigned from Time Warner." *Id.* at TW0047-48.

[46]     *Id.* at TW0011.

[47]     *Id.* at TW0018.

10

received under his employment agreement, he released Time Warner from all claims arising from his employment or termination.[48]

### 3. Formation of Trascent

In the summer of 2011, Kishan learned that Bouri no longer worked at Time Warner. On July 26, 2011, Kishan emailed Bouri, "I understand that you have moved on from Time Warner. Just wanted to connect to see what you are up [to] – perhaps there may be opportunities to collaborate."[49] On August 5, Bouri responded, "Thank you for reaching out. Yes, I have since resigned from Time Warner. I will happily explain the reasons when we speak."[50]

During their initial conversations, Bouri explained that he had resigned from Time Warner because he was being "micromanaged."[51] He told Kishan that his supervisor was annoyed that Bouri drove his Bentley into the office at 10:30 a.m. because "it set a bad example to the other employees."[52] Bouri also told Kishan he was making $2.5 million a year in total compensation at Time Warner as the head

---

[48]     *Id.* at TW0017.

[49]     JX 6.

[50]     *Id.*

[51]     Tr. 12 (Kishan).

[52]     Tr. 13 (Kishan).

11

of Global Shared Services and Senior Vice President.[53]  The two spoke again in 2012, and Bouri provided Kishan with a copy of his Time Warner employment agreement.[54]  The employment agreement Bouri sent to Kishan said that Bouri was "Senior Vice President, Global Shared Services & Real Estate and Facilities Management" and that his base salary was $600,000 per year with a target annual bonus of eighty-five percent of his base salary.[55]

---

[53]  Tr. 13-14 (Kishan).  The title head of Global Shared Services indicated "a much broader role" than Senior Vice President for Real Estate and Facilities.  Tr. 32 (Kishan).  *Compare* Tr. 13-14 (Kishan) *with* JX 306, at TW0019.

[54]  Kishan testified that he did not follow the usual, formal practice for employees where the company would verify employment and compensation because Bouri was coming on as a partner.  Tr. 18-19 (Kishan).  Instead, Kishan believed the representations Bouri made to him because he trusted him, which was "vital."  Tr. 19, 24 (Kishan).

[55]  JX 13.  There are a series of discrepancies between the purported Time Warner employment agreement Bouri sent to Kishan and the employment agreement Time Warner produced in this litigation.  The differences include Bouri's base salary, title, bonus percent, and amount of stock options.  *Compare* JX 306 *with* JX 13.  When asked about these differences at trial, Bouri testified that he went back and forth in negotiations with Time Warner and must have inadvertently sent Kishan one of the draft agreements.  Tr. 533 (Bouri).  This testimony lacks credibility because the documents are both signed by the same representative of Time Warner, but with different signatures, and both versions are marked with the same version control number, version three.  *Compare* JX 306 *with* JX 13 *and* Tr. 534-35 (Bouri).  There are also numerous typographical errors in the version Bouri sent to Kishan.  JX 13; Tr. 538-41 (Bouri).  Bouri testified that he did not edit the document he sent to Kishan, and any discrepancies were a result of the editing process between him and Time Warner.  Tr. 536, 542 (Bouri).  I excluded JX 13 for the purpose of showing fraudulent inducement because Trascent failed to raise the exhibit in a timely manner.  Pretrial Conference Tr. 18.  I allowed JX 13 to be introduced for other reasons, such as impeachment or credibility.  *Id.*

Kishan testified that during the conversations he had with Bouri between 2012 and 2013, Bouri "always represented himself as a man of substantial financial means."[56] Kishan testified that Bouri "talked about his Aston Martins. He talked about his home in Atherton, California, where the average price per home, he informed me, was $5 million. He talked about growing up in the south of France. He said his father was the largest cement trader in the world" and "that he grew up in lavish homes all around the world."[57] Bouri told Kishan that while Bouri "was at Sun Microsystems he earned hundreds of millions of dollars and he gave a lot of that money away."[58] This wealth was important to Kishan because Kishan was looking for a partner who would be able to invest capital in the business in exchange for equity.[59]

Bouri also informed Kishan that he wanted to join Kishan's small company because Bouri had been advised by "his recruiting agent or, you know, recruiting firm, Heidrick & Struggles or Korn Ferry, one of those big placement agencies," that

---

[56]     Tr. 22 (Kishan).

[57]     *Id.*

[58]     Tr. 22-23 (Kishan).

[59]     JX 21 (email from Kishan to Bouri explaining that Trascent will be valued "based on cash contributions" and that "[e]quity is not granted, it is paid for," and the buy-in process is "you give cash and you [get] equity immediately"). Trascent's ultimate LLC Agreement also supports this. JX 56, at Art. III.

13

"given where he was in his career, he needed to show that he could be entrepreneurial, that he can join a small firm . . . and develop it further, that would be good for his career."[60]

The two continued to negotiate going into business together.[61] Bouri "insisted" that he would only come on board as an equity partner.[62] Bouri testified that Kishan first approached him with an offer to join UMS Advisory, but Bouri responded, "'Unless [Kishan] form[ed] a different corporate structure that [made Bouri] an equity partner,' [he] would not be interested in joining."[63] In April 2013, Kishan formed a limited liability company, UMS Advisory, LLC, which later changed its name to Trascent, to help move the negotiations along.[64] Bouri joined UMS Advisory on a temporary basis in June 2013 as "managing director or managing principle of the U.S. and [was] handed . . . the HR function and the finance

---

[60]    Tr. 23-24 (Kishan).

[61]    JX 7; JX 9; JX 10; JX 17; JX 20; JX 21.

[62]    Tr. 20 (Kishan).

[63]    Tr. 639 (Bouri).

[64]    Tr. 241 (Patel Kishan) ("Q: Was the original intent to do business under that name, UMS Advisory, LLC? A: No. We just opened it using that name just to make sure we can open the company and then a new name would be found and then later adapted -- adopted."); Tr. 119 (Kishan).

14

function and the IT function."[65] This interim arrangement was to be, and in fact was, in effect only until Kishan and Bouri completed the LLC documents.[66]

As of January 1, 2014, Trascent would initiate operations, take over all of UMS Advisory's consulting projects, and hire all of UMS advisory's employees.[67] UMS Advisory, however, would retain its existing assets and liabilities.[68]

Trascent's operating agreement (the "LLC Agreement") was effective January 1, 2014, and Bouri's role in the newly formed Trascent was "head of the HR function, the finance function, the IT function, and head of the U.S. consulting business."[69] The members of Trascent acquired their interests with promissory notes.[70] Bouri "was averse to putting in cash. So he came up with the idea of a

---

[65] Tr. 39 (Kishan). "UMS[ Advisory's] hire of Bouri was understood by both parties to be an interim arrangement. Kishan and Bouri agreed that Bouri would acquire a minority stake in an entity to be co-owned by Kishan." PTO ¶ II.9.

[66] JX 27; Tr. 666-67 (Bouri).

[67] Tr. 44 (Kishan). The original date was December 2, 2013, but in March 2014, the members of Trascent decided to retroactively adjust the starting date to January 1, 2015. JX 66; Tr. 250 (Patel Kishan).

[68] *Id.*

[69] Tr. 39 (Kishan).

[70] Tr. 24 (Kishan).

promissory note instead as a substitute for cash."[71]  In fact, "[h]e insisted on it."[72]  The other members "agreed to it because [they] felt here's a wealthy man who will fulfill his obligation to meet the note, that he had the means of doing so.  [They] trusted him."[73]

### 4.  Trouble at Trascent

Everything went well for the first several months of 2014.  Bouri was bringing in business, and Trascent was celebrating milestones.[74]  But behind the scenes, known to some and unknown to others, Bouri was exacerbating cash flow issues at Trascent, sowing seeds of dissent, and plotting to overthrow Kishan.

### a.  Trascent's cash flow issues

Trascent was undercapitalized from the start.[75]  Patel Kishan testified that the startup date for Trascent was December 2, 2013, but the only cash available to Trascent as of that date was $25,000 contributed by Fastovsky.[76]  Neither Bouri nor Kishan put any cash into Trascent, instead financing their equity purchases with

---

[71]    Tr. 24, 43 (Kishan).

[72]    Tr. 20 (Kishan).

[73]    Tr. 24-25 (Kishan).

[74]    JX 80; JX 195.

[75]    Tr. 255-57 (Patel Kishan).

[76]    Tr. 250, 253 (Patel Kishan).

promissory notes.[77]  In order for Trascent to meet its financial obligations, Patel Kishan started "throwing money from" UMS Advisory into Trascent as a courtesy because so many people were "depending" on Trascent.[78]  In January 2014, Patel Kishan informed Bouri of the situation, but she testified that she got no guidance or leadership from Bouri.[79]  For the first four months of Trascent, UMS Advisory gave Trascent "hundreds of thousands of dollars . . . to [ensure] Trascent made it."[80]

Trascent finally started bringing in revenue in 2014, but despite all the new business, Trascent was not profitable that first year.[81]  This was, in part, because Bouri increased Trascent's overhead costs substantially, putting a strain on Trascent's resources.[82]  In October 2014, Trascent's director of finance, Janice Shaffer, emailed the Board to let them know Trascent was "in a cash shortage position and [the Board] need[ed] to make hard decisions regarding staffing and that this cash shortage is due to the fixed employee costs in the company." [83]  After that

---

[77]  *See* Tr. 253 (Patel Kishan).

[78]  Tr. 259 (Patel Kishan).

[79]  Tr. 257-58 (Patel Kishan).

[80]  Tr. 263 (Patel Kishan).

[81]  Tr. 200 (Kishan).

[82]  In 2012, the net income of UMS Advisory was $915,000.  In 2013, when Bouri signed on, the net income was $78,000.  Tr. 244 (Patel Kishan).

[83]  Tr. 52-53 (Kishan).

email, Fastovsky and Kishan started to pressure Bouri about cost reduction and headcount reduction to match the lack of revenues in the U.S. "[Bouri] became exceedingly erratic, hostile towards the board."[84]

A few days later, Shaffer reached out to Bouri and Kishan because "there was an [American Express] payment that was due [in October] and if [Trascent] did not make that payment, the entire balance on the corporate credit card would be immediately due to [American Express]."[85] Kishan testified, "[Shaffer] needed [$]50,000 to cover that bill that was due and she asked me to put in [$]25,000 and she asked Mr. Bouri to put in the remaining [$]25,000 to meet this company obligation."[86] "She called me in a panic and said he is not willing to talk to her until Monday, when it would be too late, and she asked me if I can put in the full amount. So I did."[87] Shaffer testified that Bouri actually told her, "You go tell Mr. Kishan he can go f[**]k himself. I am not giving a dime," and "when [she] had to call

---

[84]     *Id.*

[85]     Tr. 53 (Kishan).

[86]     *Id.*

[87]     Tr. 53-54 (Kishan).

18

[Kishan] and ask him for the money, [she] didn't tell him what [Bouri] said."[88] Kishan "gave [her] the money right away."[89]

Despite Trascent's cash flow situation, and Bouri's refusal to contribute any cash to help avert the credit card issue,[90] Bouri requested advances on his paycheck three times: November 2014, December 2014, and March 2015.[91] For the first two requests for an advance, Bouri explained to Shaffer that his accountant had run afoul of Regulation D.[92] The third time, he gave Shaffer a very long explanation involving identity theft in two states, a diminished credit score from Trascent's line of credit, and the fact that he had taken a significant pay cut when he started at Trascent.[93] Bouri asked Shaffer not to share his requests for these advancements, or his personal financial matters, with the other members of Trascent.[94]

---

[88]     JX 331, at 81-83.

[89]     *Id.* at 83.

[90]     *Id.*

[91]     JX 117; JX 124; JX 353.  Bouri also requested and received a $50,000 advance on his bonus in December 2013.  JX 77; Tr. 438 (Patel Kishan).

[92]     JX 117; JX 124.

[93]     JX 353. Bouri repaid each advance through deductions from his paycheck or by cashing out his accrued vacation time.  Tr. 868-69 (Bouri).

[94]     Tr. 868-69 (Bouri).

19

### b. Bouri's hidden fraud

The cash advances were not the only thing Bouri was hiding from the other members of Trascent. On May 6, 2014, Bouri attended an annual fundraising event hosted by Michael Herklots, the Vice President of Retail & Brand Development for Nat Sherman International, Inc. ("Nat Sherman"), a New York cigar company.[95] Bouri purchased several lots, totaling $7,050.[96] Bouri later submitted his reimbursement to Trascent, claiming the purchased items as business expenses; however, he did not list the items he actually purchased.[97] Instead, unbeknownst to anyone at Trascent, Bouri fabricated a letter on Nat Sherman letterhead purporting to thank Bouri for Bouri's purchase of alternative lots.[98] Bouri then submitted that letter to Trascent as part of his business expenses.

Bouri testified that he fabricated the letter because there were clients with him at the fundraiser, and he did not want the actual purchases to reflect poorly on them.[99] Bouri explained this was because the clients' companies had procurement policies regulating what employees could receive from consultants, to avoid corruption and

---

[95]    JX 314, at 3.

[96]    *Id.* at Ex. A-2.

[97]    Tr. 465 (Bouri).

[98]    JX 314, at Ex. A-5; Tr. 449, 465-66 (Bouri).

[99]    Tr. 473-75 (Bouri).

20

undue influence, and receiving the actual lots purchased at the auction, as they had, violated those policies.[100]  If a company client audited Trascent's records at some point in the future, as Bouri testified was a relatively common occurrence, the company client would not see that Trascent had violated the company's procurement policies because the forged documentation would deceive them.[101] Trascent did not discover the forgery until after Bouri had left Trascent.[102]

---

[100]    Tr. 477-78 (Bouri).

[101]    Tr. 479-81 (Bouri).

[102]    Tr. 95-96 (Kishan). The other members of Trascent did not discover the rest of Bouri's other questionable expenses until after he had departed Trascent.  Schaffer emailed Kishan on April 20, 2015, with a compilation of Bouri's expenses saying, "[Bouri] certainly liked to spend extravagantly.  . . .  Constant use of limos, entertaining clients, and expensive meals are more than I think is necessary for a company of this size, but that is a business decision." JX 331.15.  She went on to list the areas of "invalid or suspicious" charges she focused on. *Id.*  She listed the following charges:

> 1) Dinners and theater events without stating client names or purpose 2) Personal cigar club membership charged to Trascent 3) Coat checks equating to $1,145 without receipts ($20 each time, avg) . . . The Kings supermarket $986 purchases were for wine that supposedly went to clients, but Tina never sent anything to anyone. . . . 6) **Recruiting meetings when we had no jobs.  In the USA, Tina would handle the resumes and set up recruiting and had no copies of resumes.  For several, specifically "Athena", this recruiting meeting was so late it went into the next day and involved heavy drinking. . . . 7) The last ship theatre event: he claims he was with Sharon Lee, but in his calendar it states an 11am meeting in lieu of dinner.  8) **Wedding for Paul Begin's daughter: it appears he charged Trascent for this personal event.  And claimed he was at a TR

21

### c. Internal investigations at Trascent

By October 2014, Bouri initiated an internal investigation into the financials of Trascent (the "Internal Investigation").[103] Before Bouri's arrival at Trascent, Patel Kishan, Kishan's wife, handled the finances in a relatively informal manner.[104] Patel Kishan facilitated the fiscal transition from UMS Advisory to Trascent[105] and admitted that she was overwhelmed with that role because of the way the handover of business from UMS Advisory to Trascent took place.[106] As a result, Trascent's books were rather disorderly. Thus, the Internal Investigation was not completely baseless.

But, Bouri also had ulterior motives for the Internal Investigation. Bouri wanted Kishan out and was going to use the Internal Investigation to do it. He told

---

leadership meeting. . . . 9) **Large expenditures for fundraisers that are unrelated to Trascent.
*Id.*

[103]    JX 331, at 28.

[104]    Tr. 314-15 (Patel Kishan).

[105]    Tr. 260-62 (Patel Kishan).

[106]    Tr. 316-17 (Patel Kishan) ("It was crazy. All the way until, you know, a little -- maybe a month before [Shaffer] joined and even then so, so busy. I'm running three entities across 12 time zones. I'm doing -- you know, I got to look at what's coming up for payables, predominantly payroll. I have to do all the invoicing. I have to fend e-mails from all over the world. You know, I'm dealing with different time zones. It was crazy. I was -- I was, you know, drinking water through a fire hose. I mean, I could just barely keep up, but -- I was so, so busy.").

22

the finance department, which he supervised, that Kishan was using Trascent as his own personal "piggy bank"[107] and that Kishan had "his hand in the cookie jar."[108] He also told them that Kishan was "financially irresponsible and irrational, and dragging [Trascent] into a financial catastrophe each month with him."[109]

The Internal Investigation centered on Kishan's promissory note with Trascent (the "Note"). Initially, the Internal Investigation was about reconciling the amounts UMS Advisory paid to or for Trascent during the first several months of Trascent's existence. Because the transition was so hectic, Bouri and Shaffer had questions about whether the correct amounts were credited against the Note.[110]

As the Internal Investigation progressed, however, it became focused on Kishan's spending and reimbursements.[111] Bouri also voiced concerns about the fact that Kishan had two employment agreements that paid him a greater salary than what had been agreed upon, charged Trascent for the preparation and filing of his personal tax returns, and insisted on reimbursement for exorbitant cell phone bills for both

---

[107]    Tr. 924 (Ryan).

[108]    JX 331, at 176-77.

[109]    JX 184.

[110]    *See* JX 132; JX 147; JX 180.

[111]    *See* JX 157; JX 172.

himself and Patel Kishan.[112] Bouri made it clear to the finance team as they continued to reconcile the Note that "the end goal result" of the Internal Investigation was to find a way to force out Kishan.[113] Eventually, Schaffer and Bouri hired an external accounting firm, EisnerAmper LLP, to take over the Internal Investigation.[114]

On March 13, 2015, Bouri, Shaffer, and another Trascent employee, Kristine McArdle, met with two EisnerAmper partners, Gerard Abbattista and Terry Simonds.[115] During that meeting, the EisnerAmper partners determined that EisnerAmper was not needed for a forensic investigation, but instead would "go through the books and records, clean up the records based on [their] interpretations of the [LLC Agreement] and the transactions that occurred in order to prepare an

---

[112] JX 81; JX 116; JX 154; JX 205; JX 208; Tr. 111-12, 133-137 (Kishan); Tr. 737-38, 749-52, 789, 904-06 (Bouri). Plaintiff objects to JX 81, 116, 154, and 205 under Delaware Rule of Evidence 802. These objections are overruled because these exhibits are not being used to show the truth of the matter asserted in the statements therein.

[113] Tr. 929 (Ryan); *see* JX 144 (email in which Shaffer informs Bouri that she might have found a $200,000 "bogus charge to [the N]ote," and Bouri responds "I hope so"); JX 188 (email in which Bouri tells Shaffer, "I can't wait until you uncover the smoking gun(s) we are all waiting for. Then a new chapter begins for Trascent."); JX 200 (email in which Bouri tells Shaffer, "Remember, we need a smoking Bazooka!").

[114] JX 198.

[115] JX 369; Tr. 830-33 (Abbattista).

accurate tax return."[116] EisnerAmper concluded their work with Trascent in July 2015.[117] They did not find "any evidence of intentional wrongdoing" or perform "a forensic investigation."[118]

### 5. Automated Data Processing investigation

The Internal Investigation was not the only investigation Bouri initiated due to his ulterior motives. On January 20, 2015, Bouri filed a complaint with Trascent's outside HR company, Automated Data Processing ("ADP"), on behalf of some female Trascent employees, including Schaffer, and a female Trascent client.[119] In the complaint, Bouri alleged that the women complained to Bouri during the month of January about Kishan's "unprofessional and inappropriate behaviors."[120] ADP initiated an investigation (the "HR Investigation").[121]

Bouri told Fastovsky about the HR Investigation. Fastovsky testified that Bouri "contacted [him] . . . sometime in early 2015 and informed [him] that a number

---

[116] Tr. 834 (Abbattista).

[117] Tr. 841 (Abbattista).

[118] Tr. 844 (Abbattista).

[119] JX 137; JX 279. Plaintiff objects to JX 137 under Delaware Rule of Evidence 802. This objection is overruled because this exhibit is not being offered to show the truth of the matter asserted in the statements therein.

[120] JX 279.

[121] *Id.*

25

of women had approached [Bouri] with concerns about being mistreated by Mr. Kishan."[122]  Bouri "also informed [Fastovsky] that Jody Brown [who worked at one of Trascent's biggest clients] had witnessed a nude photograph at a dinner. And that because of these incidents . . . an ADP investigation would have to be launched to make sure and go after these incidents."[123]  Kishan did not know about the ADP investigation until late March 2015.[124]

As the HR Investigation continued, Bouri encouraged the alleged complainants to take part.  His executive assistant, Tina Ryan, described her interactions with Bouri regarding the HR Investigation.

> [Bouri] wanted to know, you know, had the people called and made their complaints. And then when he received updates from Heather at ADP as to who had or hadn't called in, I would get the phone call from [Bouri] directing me to contact those individuals that had not called in on their own and ask them are they going to call in. When are they going to call in? And then in a conversation in that time frame with [Bouri], I had asked him -- you know, I stated I wasn't feeling very comfortable with it because it could be collusive. We're asking people to participate in something they weren't doing of their own accord. But that was not met well.[125]

---

[122]    Tr. 1049 (Fastovsky).

[123]    *Id.*

[124]    *See* Tr. 59-60 (Kishan).

[125]    Tr. 926-27 (Ryan).

26

In response to this "encouragement," several women made statements to ADP. The ADP final report includes these statements, which allege that Kishan created "a hostile work environment."[126] There were four complainants. The first stated that Kishan embarrassed her by criticizing her and saying "derogatory things" in front of her project team.[127] The second complainant stated that Kishan told her things were "going to get really ugly and you're not going to like it" if she did not approve his $40,000-$50,000 cell phone bill.[128] The second complainant also stated that she was "extremely uncomfortable" being in the middle of Bouri and Kishan and that she saw a document that Kishan had put together alleging she was "trying to rip off the company."[129] The third complainant alleged that she got a "verbal lashing" from Kishan when she was out sick and did not respond to one of his emails and that Bouri told her Kishan had been bad mouthing her.[130] The fourth and final complainant, Brown, alleged that "[i]n September 2014, the project team (25-30) people went out to dinner at a restaurant in Singapore. At the dinner [Kishan] was talking about his recent vacation and he showed pictures (on his cell phone), of his

---

[126]    JX 279.

[127]    *Id.*

[128]    *Id.*

[129]    *Id.*

[130]    *Id.*

27

nanny in a bikini," which made her "uncomfortable" and was "inappropriate at a business function."[131]

In March 2015, the Board had "a very difficult board meeting."[132] According to Kishan, Bouri told him, "You have to leave the firm or I leave the firm or you back down."[133] Kishan continued, "It was very hostile. It was a profanity-laced rant by Mr. Bouri. It was a very difficult board meeting."[134] Kishan testified that he did not understand what Bouri was saying at first. Kishan testified that Bouri "made representations such as, you know, you're a bully and they're coming to me. I didn't know what that meant at that time. But he seemed to say back down and things like that. It was a little perplexing as to what he was getting at."[135] But, Kishan testified, "It was definitely a veiled threat of some sort."[136]

Kishan finally understood the threat when he got a call from ADP on March 26, 2015, informing him that they were investigating allegations that he was creating

---

[131]    *Id.* When Bouri found out ADP had spoken to this complainant he responded, "Hallelujah!!! Isn't that all we were looking for, i.e. for her to corroborate as the client and as a female executive who was offended by his behaviors? Please confirm." JX 232.

[132]    Tr. 58 (Kishan).

[133]    *Id.*

[134]    *Id.*

[135]    Tr. 58-59 (Kishan).

[136]    Tr. 59 (Kishan).

28

a hostile work environment.[137]  During this phone call, Kishan concluded that Bouri had fabricated the HR Investigation and involved a client in an internal HR matter, which he determined constituted "cause" for termination under Bouri's employment agreement (the "Employment Agreement").[138]  On April 8, 2015, Kishan, as the majority holder of Class A Units, removed Bouri and Fastovsky from the Board by written consent.[139]  Kishan, as the only remaining member of the Board, then terminated Bouri's employment for cause under the Employment Agreement.[140] Several days later Kishan reinstated Fastovsky to the Board.[141]

Shaffer recanted her complaint before ADP issued its final report.  A footnote in the final ADP report states, "On April 15, 2015, after Mr. Bouri was terminated from the company, Ms. Shaffer alleged she was coerced to participate in the investigation.  Ms. Shaffer further alleged that Mr. Bouri told her if she didn't participate in the investigation, she would be fired."[142]  Shaffer testified that she felt

---

[137]    Tr. 60 (Kishan); JX 279.

[138]    Tr. 73, 80, 84-85 (Kishan).

[139]    PTO ¶ II.55.

[140]    PTO ¶¶ II.56, II.58.

[141]    Tr. 1080 (Fastovsky).

[142]    JX 279.

29

coerced by Bouri into making the complaint.[143]  Later in her deposition, she testified that Kishan encouraged her to recant her statement after Bouri's termination.[144] Ultimately, ADP concluded that "[t]he evidence does not establish that a violation of the Harassment Prevention Policy has occurred, as alleged by [the Trascent employees and client]."[145]  After ADP completed its report, one of the complainants filed a charge of discrimination with the Equal Employment Opportunity Commission against Trascent.[146]  Additionally in this litigation, two of the other complainants testified that Bouri encouraged or pressured them to submit their statements.[147]

## C.    Credibility

The credibility of the two main actors, Kishan and Bouri, is central to the outcome of this litigation.  So much so that the parties included a separate credibility section in each of the four post-trial briefs.[148]  Judicial opinions typically exist in a closed universe of only the record presented by the parties.  My credibility

---

[143]    JX 331, at 99-100.

[144]    JX 331, at 333.

[145]    JX 279.

[146]    JX 438.

[147]    JX 339, at 17-18, 41-42; Tr. 999-1001 (Liu).

[148]    *See* Pl.'s Opening Br. 9; Def.'s Answering Br. 5; Pl.'s Reply Br. 2; Def.'s Sur-Reply Br. 2.

determinations are based on the testimony and evidence submitted to make up that record and the patterns of behavior reflected in the testimony and evidence. While I discuss some examples point by point, my determination is holistic—made by looking at the record in its entirety. My credibility determinations should not be taken as a statement of universal truth as to a person's character. Instead, they provide the explanation for why certain evidence carries more weight.

I tend to give more weight to the contemporaneous evidence, as it is free from the realities of litigation and closer in time to the events that transpired. But this evidence does not always resolve all disputes. When I only have testimony, and the testimony conflicts, I must determine whose testimony to credit. Within the limited context of this litigation, for the reasons that follow, I find Kishan to be more credible than Bouri and, thus, tend to place more weight on his testimony when it conflicts with Bouri's and there is an absence of contemporaneous evidence.

Neither Kishan nor Bouri has been portrayed in the best light during this litigation, but the salient difference is that while Kishan may not make the best decisions,[149] Bouri has repeatedly lied, before and during this litigation.[150]

Bouri repeatedly asserted under oath that he resigned from Time Warner until eventually admitting he never resigned before he was terminated, which Time Warner's contemporaneous business records (the "Business Records") confirm.[151] Bouri also has repeatedly asserted that he did not and does not know of any basis for his termination from Time Warner, but the Business Records show that Bouri was warned that he was being terminated because his superiors lost confidence in his business judgment.[152] Bouri also repeatedly asserted that he was never told of any allegations against him, but again, the Business Records show he was told in detail

---

[149]    *See* JX 128 (spending extravagantly despite limited finances); JX 184 (requesting $40,000 loan from Trascent's line of credit to pay personal credit card bill); JX 273-74 (directing Shaffer to pay his $2,000/month cell phone bill, which was $1,700/month higher than approved under Trascent's policy, immediately after firing Bouri who would not approve payment of the bill); JX 361 (continuing to spend extravagantly despite limited finances); Tr. 172-74 (Kishan) (removing both Bouri and Fastovsky from the Board before firing Bouri for initiating an HR investigation into Kishan that Kishan determined was fraudulent).

[150]    Tr. 448 (Bouri).

[151]    *Compare* JX 6, JX 304, JX 305 *and* Tr. 520, 521, 550, 612, 620 (Bouri) *with* JX 306 *and* Tr. 855 (Bouri).

[152]    *Compare* JX 304 *and* Tr. 550-51 (Bouri) *with* JX 306, at TW 0002-03.

about the allegations made against him.[153] Further, Bouri forged expense documentation and presented the forgery for reimbursement purposes in order to help his clients circumvent the monitoring policies of their employers intended to prevent fraud and undue influence.[154] Finally, Bouri presented to Kishan an altered version of his Time Warner employment agreement that inflated his position, salary, and bonus.[155] Bouri admits that he forged the Nat Sherman letter,[156] and the Time Warner business documents show that he knew of at least some basis for his termination and that he gave a false employment agreement to Kishan.[157] In the face of such a pattern, I do not find Bouri to be a credible witness regarding the events leading to this litigation.

Conversely, Kishan's actions, while evidencing questionable judgment, do not give me reason to doubt the credibility of his testimony during the course of this litigation. Bouri points to three examples of behavior that he argues undermine

---

[153] *Compare* JX 304 *and* JX 305 *with* JX 306, at TW0052.

[154] PTO ¶ II.50; Tr. 473-77 (Bouri).

[155] *Compare* JX 13, at D192757-58 *with* JX 306, at TW0019-20. Bouri testified that he "inadvertent[ly]" gave Kishan a preliminary version of his Time Warner employment agreement and "did not purport that [it] was [his] final Time Warner agreement." Tr. 447 (Bouri). This statement is belied by the evidence. See *supra* note 55.

[156] Tr. 448 (Bouri).

[157] JX 306, at TW0019-41, TW0052.

Kishan's credibility.[158]  First, Trascent was erroneously charged $20,000 for the preparation of Kishan's personal tax returns.  The same accountant prepared Trascent's and Kishan's tax returns and sent a single, unclear invoice that Patel Kishan mistakenly paid.[159]  This error was discovered and corrected.[160]  Second, Bouri alleges that Kishan attempted "to offset Kishan's $520,000 promissory note with questionable credits, falsely claiming that the [N]ote had been fully satisfied and that Trascent owed Kishan money on top of that."[161]  As the discussion above about the transition from UMS Advisory to Trascent makes clear, UMS Advisory gave Trascent significant loans during the first few months of Trascent's

---

[158]  Bouri also points to two facts he claims undermine Patel Kishan's credibility.  First, he claims that Patel Kishan "submitted to Trascent thousands of dollars of expense reimbursement requests on Kishan's behalf without the required back-up documentation."  Def.'s Sur-Reply Br. 3.  Patel Kishan testified that she used the American Express statement as backup for the expense reimbursement requests she submitted because it provided extensive detail.  Tr. 299-300 (Patel Kishan) ("It provides the date, the name of the vendor, the amount.  It provides additional information.  If it was an airfare, it would provide date of departure, the airline that was used.  If it was a hotel charge, it would provide date of arrival, date of departure.  If it was a meal, it would state the amount of the meal and then the tip that was provided for.").  Second, Bouri claims that Patel Kishan "purposefully and improperly kept herself on Trascent's payroll to maintain certain US benefits while simultaneously also remaining on the payroll of Trascent's Swiss subsidiary."  Def.'s Sur-Reply Br. 3.  The only evidence Bouri points to as support for this contention is his testimony.  I do not find this sufficient evidence to show that Patel Kishan did anything dishonest.

[159]  JX 331, at 600-01.

[160]  *Id.*

[161]  Def.'s Sur-Reply Br. 3.

operation.[162] Patel Kishan kept a log of these loans in Trascent's books as credits against Kishan's note because it was better for Trascent than having large payables on its books.[163] The Note itself was never altered.[164] Nor did the Kishans try to avoid a proper accounting and reconciliation of Trascent's finances and Kishan's note.[165] In fact, Kishan encouraged it.[166] Both Shaffer and EisnerAmper independently reconciled the Note.[167] What Bouri tries to paint as "false claims" were nothing more than statements based on incomplete data or hopes about what the outcome might be.[168] Finally, Bouri points to the fact that Kishan had two employment agreements, one with Trascent and one with the Swiss entity, that resulted in him receiving higher compensation than Kishan and Bouri had agreed.[169] While I do not condone Kishan's two employment agreements, that one action does not completely undermine Kishan's credibility or overcome the evidence against

---

[162] Tr. 288 (Patel Kishan).

[163] Tr. 291 (Patel Kishan).

[164] Tr. 289 (Patel Kishan).

[165] JX 331, at 249.

[166] *Id.* at 603.

[167] *Id.* at 278-79; JX 331.18.

[168] JX 109.

[169] Def.'s Sur-Reply Br. 3.

Bouri's veracity. Thus, when the testimony of Kishan and Bouri conflicts, I tend to credit Kishan's testimony over Bouri's testimony.

## II. ANALYSIS

"To succeed at trial, 'Plaintiffs, as well as Counterclaim–Plaintiffs, have the burden of proving each element . . . of each of their causes of action against each Defendant or Counterclaim–Defendant, as the case may be, by a preponderance of the evidence.'"[170] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[171]

### A. Fraudulent Inducement

Trascent argues that Bouri fraudulently induced it to enter into the Employment Agreement and the LLC Agreement. As a result, Trascent seeks to rescind the Employment Agreement, and it seeks a declaration that Bouri may not enforce the LLC Agreement. "The elements of fraudulent inducement are the same

---

[170]    *S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *15 (Del. Ch. Mar. 15, 2017) (quoting *inTEAM Assocs., LLC v. Heartland Payment Sys., Inc.*, 2016 WL 5660282, at *13 (Del. Ch. Sept. 30, 2016)), *aff'd*, 177 A.3d 610 (Del. 2017).

[171]    *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

36

[as] those of common law fraud."[172]  The Supreme Court of Delaware defines those elements:

> (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[173]

As more fully explained below, Bouri made false representations about his departure from Time Warner and his personal wealth that he knew were misleading to induce Kishan to form Trascent and make Bouri a member and manager.  Kishan and Trascent relied upon these statements by forming Trascent and making Bouri a member and manager, which resulted in damage to Trascent.

### 1.     Trascent can rely on statements made before it existed

Bouri first argues that Trascent's claim must fail because "[a]s a matter of law, Trascent cannot base its claim upon alleged misrepresentations that predate its existence," and Trascent was not formed until after Bouri made the statements in

---

[172]    *LVI Grp. Invs., LLC v. NCM Grp. Hldgs., LLC*, 2018 WL 1559936, at *11 (Del. Ch. Mar. 28, 2018) (alteration in original) (quoting *Smith v. Mattia*, 2010 WL 412030, at *5 n.37 (Del. Ch. Feb. 1, 2010)).

[173]    *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461-62 (Del. 1999).

question. [174]  In *Nye Odorless Incinerator Corp. v. Felton*,[175] the Delaware Superior Court outlined a two-part test to determine whether an entity could assert a claim based on fraudulent misrepresentations made before it was formed.  An entity can maintain a claim based on misstatements made before its formation when (1) the fraudulent statements were made to an innocent individual to induce him/her to form an entity and have that entity take certain actions, and (2) that individual forms the entity and causes it to take said actions.[176]

*Nye* concerned the acquisition of a Georgia company by a Delaware entity formed solely for the acquisition.  The question the Superior Court answered in *Nye* is essentially the same question posed here: "[C]an a suit be maintained at law, sounding in tort, at the instance and in the name of a corporation based upon alleged fraudulent misrepresentations by a vendor to the promoter of the proposed corporation, which was afterwards incorporated?"[177]  The court summarized the parties' arguments:

> The defendant contends that the suit cannot be maintained by the corporation for any supposed misrepresentation prior to the existence of the corporation. . . . The plaintiff contends that where false and fraudulent

---

[174]    Def.'s Answering Br. 9-10.

[175]    162 A. 504 (Del. Super. 1931).

[176]    *See id.* at 508.

[177]    *Id.*

38

misrepresentations are made to individuals to induce them to form a corporation for the purpose of purchasing property, or rights, or entering into a contract, and the corporation, when created by such individuals, who become its stockholders and officers, acts upon such representations to its injury, it may maintain an action.[178]

The court explained its analysis:

The plaintiff bases its contention on the general and underlying proposition that where misrepresentations are made to one person, with the intention that they be communicated to another, and acted upon by such other, and as a fact such representations are communicated and acted upon to the prejudice of a stranger, an action of deceit will lie. This general proposition is not disputed by the defendant but only its application to the case of a nonexistent corporation.[179]

The court then looked to *Ehrich on Promoters*:

If representations are made with the purpose of inducing persons to organize a corporation, to take over certain property or to enter upon particular engagements and the persons deceived do, in reliance upon the representations made, organize the corporation and cause it to take the contemplated action, it may fairly be said that the representations were made with intent to deceive the corporation, that it was deceived thereby and acted thereon to its damage.[180]

---

[178]    *Id.* (citation omitted).

[179]    *Id.*

[180]    *Id.*

Ultimately, the court found that the corporation could bring the fraud claim relying on statements made before it existed when the statements were made to induce the creation of said corporation and to have the corporation take certain actions.

The events that transpired here are directly in line with the holding of *Nye* and the two-part test established therein. In *Nye*, the vendor made statements to the promoter that induced the promoter to form a corporation and cause that corporation to purchase the assets of a Georgia corporation.[181] Here, Bouri made statements to Kishan, discussed below, that induced Kishan to form Trascent and caused Trascent to enter into an employment agreement with Bouri.[182] Moreover, Bouri's statements to Kishan induced Trascent, once formed, to make Bouri not just an employee but a unitholder and manager. In that way, this case is even more compelling than *Nye*. To hold otherwise would be to ignore the harm suffered by Trascent in its very conception, structure, and management.

Relying on *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, Bouri contends that Trascent's claims must fail as a matter of law.[183] This Court described

---

[181]     *Id.* at 505.

[182]     Tr. 20 (Kishan); JX 15 (explaining that Bouri told Kishan the formation of an LLC would "entice" him to join); JX 18 ("[W]e discussed in the past the concept of an 'employment agreement' so as to protect both of us. In that spirit, I sent you a copy of my Time Warner Agreement.").

[183]     906 A.2d 168 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007).

*Trenwick* as an "unusual" case.[184]  "The primary defendants . . . were directors of a publicly listed insurance holding company.  All but one of the eleven directors [were independent]. The other director was the chief executive officer of the holding company."[185]  "The holding company and its top U.S. subsidiary filed for bankruptcy.  The cause of the failure was that the claims made by the insureds against the holding company's operating subsidiaries . . . exceeded estimates and outstripped the holding company's capacity to service the claims and its debt."[186] As part of the bankruptcy, a Litigation Trust was created.  "That Trust was assigned all the causes of action that the U.S. subsidiary owned."[187]

The Litigation Trust then brought a case and supported its claim with the following allegations:

> [T]he majority independent board of the holding company engaged in an imprudent business strategy by acquiring other insurers who had underestimated their potential claims exposure.  As a result of that imprudent strategy, the holding company and its top U.S. subsidiary were eventually rendered insolvent, to the detriment of their creditors. Not only that, because the top U.S. subsidiary took on obligations to support its parent's debt and actually assumed some of that debt, the top U.S. subsidiary

---

[184]     *Id.* at 172.

[185]     *Id.*

[186]     *Id.*

[187]     *Id.*

and its creditors suffered even greater injury than the holding company and its creditors.[188]

"At the tail end of its complaint, the Litigation Trust allege[d] that the Trenwick and Trenwick America directors committed fraud, in concert with each other and with outside advisors to Trenwick. The fraud alleged consists of non-disclosures and material misstatements of fact."[189] "The complaint allege[d] that the Trenwick and Trenwick America officers and directors had a duty to disclose [certain] facts to [the] 'Plaintiff.'"[190] This Court supposed that by "Plaintiff," the party bringing the suit, the Litigation Trust, meant "the entity whose claims it now possesses, Trenwick America."[191]

"Allegedly, the Trenwick directors knew 'these statements were false when made.' . . . 'Plaintiff'—i.e., Trenwick America—supposedly relied detrimentally on the statement."[192] This Court went on to say, "Remember that the Litigation Trust only has the ability to assert a claim that Trenwick America possesses."[193]

---

[188] *Id.*

[189] *Id.* at 186.

[190] *Id.* at 187.

[191] *Id.*

[192] *Id.*

[193] *Id.* at 191.

42

The final claim made against the directors of both Trenwick and Trenwick America is that they worked together to commit fraud that injured Trenwick America. This is an extremely odd claim to be advanced on behalf of Trenwick America for an obvious reason: the claim depends on the notion that Trenwick America's controlling stockholder, Trenwick, and Trenwick America's board, in particular, Billett, who was on the parent board as well, knew facts about Trenwick America that they concealed from Trenwick America.[194]

This Court held that "the plain vanilla reason the fraud claim fails, . . . is that the complaint does not satisfy the stringent pleading standard governing fraud claims."[195] In addition to this holding, this Court went on to say,

> [T]he Litigation Trust fails to plead a fraud claim for another important reason . . . . The Litigation Trust is only entitled to bring claims possessed by Trenwick America. By the Litigation Trust's own admission, Trenwick America's board of directors knew the true facts about all the issues said to have been misrepresented. As a result, Trenwick America—as an entity—did not rely to its detriment on any of the misstatements, despite the cursory statement in the complaint that the "plaintiff" relied on the false statements to its detriment.[196]

This Court then stated,

> To the extent that the Litigation Trust is referring to itself, it could not have relied on the statements at issue as it did not exist when those statements were made. To the extent

---

[194]   *Id.* at 207.

[195]   *Id.*

[196]   *Id.* at 211.

43

that the Litigation Trust is referring to Trenwick America, its statement makes no sense because the complaint alleges that those who controlled Trenwick America knew the statements were inaccurate.

. . .

[T]he entity would not have been relying to its detriment on the fraudulent statement because its controllers were aware of the actual state of affairs. For this reason, our law has treated claims by stockholders that corporate disclosures in connection with a stockholder vote or tender were materially misleading as direct claims belonging to the stockholders who were asked to vote or tender.[197]

The line on which Bouri's entire argument rests, "[t]o the extent that the Litigation Trust is referring to itself, it could not have relied on the statements at issue as it did not exist when those statements were made,"[198] is dicta, in a case with completely different facts than the one here. More importantly, *Trenwick* does not pass the first step of the *Nye* test as the supposedly fraudulent statements did not induce the formation of the Litigation Trust. In fact, the Litigation Trust had no relation to the alleged fraudulent statements whatsoever. The inducement to form a new entity and the intent to have the new entity rely upon the statements makes this case akin to *Nye* and distinguishable from *Trenwick*. Thus, Trascent could rely on the statements made to Kishan.[199]

---

[197]    *Id.* at 211-12.

[198]    *Id.* at 211.

[199]    Bouri argues that *Nye* does not support Trascent's position because in *Nye* "the underlying transaction documents demonstrated that the individuals to whom the

### 2. Bouri made representations he knew were false with the intent of inducing action by Trascent

To succeed on its fraud claim, Trascent must show that Bouri made misrepresentations he knew were false with the intent to induce action by Trascent. Trascent argues that Bouri made false and misleading statements about his departure from Time Warner and his personal wealth. For the reasons that follow, I find that Bouri knowingly made false and misleading statements about his personal wealth and his reasons for leaving Time Warner to induce Trascent to enter into the LLC Agreement and Employment Agreement.

### a. The false statements about Bouri's departure from Time Warner and his personal wealth

"A misrepresentation is an assertion that is not in accord with the facts."[200] "[F]raud does not consist merely of overt misrepresentations," but "[i]t may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak."[201] One has a duty to speak to correct an omission "in order to prevent

---

statements were made should be viewed as 'equitable stockholders, potential stockholders, or . . . some other name which would indicate that they had rights in the corporation . . . .' at the time of the misrepresentation," but here there are no documents indicating Kishan or Fastovsky should be treated as owners of Trascent in August 2011. Def.'s Sur-Reply Br. 5-6, 6 n.5. The court in *Nye* discusses equitable stockholders because of a rule regarding promoters and assignment of stock that is inapplicable here. *See Ehrich on Promoters* §§ 120-23.

[200] Restatement (Second) of Contracts § 159 (Am. Law. Inst. 1981); *accord Norton v. Poplos*, 443 A.2d 1, 5 (Del. 1982).

[201] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

statements actually made from being misleading."[202]  "[A]lthough a statement or assertion may be facially true, it may constitute an actionable misrepresentation if it causes a false impression as to the true state of affairs, and the actor fails to provide qualifying information to cure the mistaken belief."[203]

There are two sources of information about what happened with Bouri's departure from Time Warner: Bouri's testimony and the Business Records. Bouri challenges the Business Records with two arguments, neither of which I find persuasive. First, Bouri argues that if the allegations in the Business Records had been substantiated, then he would have been terminated for cause. This does not necessarily follow. A company may choose not to terminate someone for cause for any number of business reasons, including to avoid costly litigation related to the termination. In fact, Bouri signed a release as part of his termination without cause. Second, Bouri argues that the allegations in the Business Records cannot be true because he had received a "glowing" evaluation in March 2011. Again, this conclusion does not necessarily follow because the allegations all could have been made between Bouri's evaluation in March and the investigation in May.

---

[202]    *Id.*

[203]    *Norton*, 443 A.2d at 5 ("For example a true statement that an event has recently occurred may carry the false implication that the situation has not changed since its occurrence. Such half-truths may be as misleading as an assertion that is wholly false.").

46

Regardless, whether the allegations were substantiated does not mean they were unrelated to his termination from Time Warner. Further, neither argument discredits the Business Records in their entirety or undercuts the fact that the Business Records show that Bouri's departure from Time Warner was completely different than the story presented to Kishan.

Bouri told Kishan he voluntarily resigned from Time Warner because he was being micromanaged.[204] He even gave examples of this "micromanagement," including that his boss wanted him to stop driving his Bentley into the office at 10:30 a.m. on workdays because "it set a bad example [for] the other employees."[205] In reality, he had been terminated without cause because Time Warner "had received complaints from [Bouri's] team . . . about [his] management and [his behavior,]" and the CEO of Time Warner and other leaders "ha[d] spent considerable time during the last year [of Bouri's employment] addressing areas of [Bouri's] performance that [were] not meeting the needs of [Time Warner]."[206] This led the CEO to lose confidence in Bouri's business judgment.[207] Further, shortly before Bouri's termination, Time Warner received and investigated serious allegations of

---

[204]     Tr. 12 (Kishan).

[205]     Tr. 13 (Kishan).

[206]     JX 306, at TW0002.

[207]     *Id.*

47

mismanagement and sexual harassment, including that he was "unreasonable, blaming others for his mistakes, aggressive, disrespectful, bullying" and that he "talk[ed] about sex all the time [in] graphic detail [and] . . . [told employees: you] look good [but I'd] have to fire you to date you."[208] One of Time Warner's attorneys discussed these allegations in detail with Bouri, and Bouri responded in detail at the same meeting.[209] Shortly thereafter, the CEO of Time Warner and an HR representative met with Bouri to inform him that he was being terminated. Finally, Bouri admitted at trial that he had not resigned before he was terminated.[210] Bouri's statement that he had resigned because he was being micromanaged was not in accord with the facts, and he knew it was not in accord with the facts. What is more, his statements gave "a false impression as to the true state of affairs," and he failed "to provide qualifying information to cure the mistaken belief."[211]

Bouri also made statements that gave the impression that he was a man of considerable personal wealth.[212] Kishan testified that Bouri "talked about his Aston Martins. He talked about his home in Atherton, California, where the average price

---

[208]     *Id.* at TW0051-52.

[209]     *Id.* at TW0002, TW0052.

[210]     Tr. 557-59 (Bouri).

[211]     *Norton*, 443 A.2d at 5.

[212]     Tr. 22-24 (Kishan).

per home, he informed me, was $5 million. He talked about growing up in the south of France. He said his father was the largest cement trader in the world" and "that he grew up in lavish homes all around the world."[213] Bouri told Kishan that while Bouri "was at Sun Microsystems he earned hundreds of millions of dollars and he gave a lot of that money away."[214] In fact, before and around the time Bouri made these statements to Kishan, Bouri knew he was struggling financially; he had significant tax liens on his home in New Jersey, had sold his Atherton, California home in a short sale, and had been forced to sell much of his stock.[215] Again, Bouri's statements gave a false impression of the true state of affairs, and Bouri never corrected the mistaken impression.

### b. Bouri made the false statements with the intent of inducing action by Trascent

"A result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his

---

[213] Tr. 22 (Kishan).

[214] Tr. 22-23 (Kishan).

[215] JX 117; JX 119; JX 124; JX 308; JX 353. Defendant objects to JX 308 under Delaware Rule of Evidence 901. This objection is overruled because under Delaware Rule of Evidence 901(b)(7) the exhibit is a public record filed in a public office, and under Delaware Rule of Evidence 902(1) the exhibit is a domestic public document under seal.

conduct."[216] The discussions and emails between Kishan and Bouri were essentially "an extended job interview" where Kishan vetted Bouri to become his partner and take over certain portions of the business, including overseeing operations and managing the U.S. consulting business.[217] Bouri knew this. In overseeing operations, Bouri would be, and in fact was, the only member with direct oversight of Trascent's HR, finances, and IT. As head of the U.S. consulting business, Bouri was also the only member in North America; the other two members of Trascent, the only people with the ability to check Bouri in any meaningful way, were on other continents.

Bouri made statements related to his previous employment and wealth to increase Bouri's chances of inducing Kishan to form Trascent and give Bouri an equity interest in Trascent. Bouri made these statements to strengthen his negotiating position relative to Kishan. Without the misrepresentations about how and why Bouri left Time Warner and the actual state of his personal finances, Bouri would not have been able to induce Trascent to employ him as the sole manager of the entire U.S. consulting business as well as the sole member in charge of global operations, without any oversight by the other members.

---

[216]   *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 811 (Del. Ch. 2014) (quoting *In re Wayport, Inc. Litig.*, 76 A.3d 296, 325 (Del. Ch. 2013)).

[217]   Tr. 18, 20 (Kishan); Tr. 639 (Bouri).

50

Bouri's misrepresentations had the intended impact on Trascent's decision to enter into business with him, on the terms of the business, and on his role at the company. Thus, Trascent has proven the first three elements of its fraudulent inducement claim by a preponderance of the evidence.

### 3. Trascent justifiably relied on Bouri's false statements

To succeed on its fraud claim, Trascent must show that it justifiably relied on Bouri's misrepresentations. Under Delaware law, justifiable reliance is measured objectively[218] and "requires that the representations relied upon involve matters which a reasonable person would consider important in determining his course of action in the transaction in question."[219] "A misrepresentation induces a party's manifestation of assent if it substantially contributes to his decision to manifest his assent."[220] "It is not necessary that [the] reliance have been the sole . . . factor in influencing his conduct. . . . It is, therefore, immaterial that he may also have been influenced by other considerations."[221]

Bouri made material misrepresentations regarding his departure from Time Warner and his personal finances that a reasonable person would consider important

---

[218] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

[219] *Craft v. Bariglio*, 1984 WL 8207, at *8 (Del. Ch. Mar. 1, 1984).

[220] Restatement (Second) of Contracts § 167 (Am. Law. Inst. 1981).

[221] *Id.* at cmt. a.

in deciding whether to make him a member of Trascent and a manager of Trascent with responsibility for the U.S. consulting business, finance, and HR. In *Kronenberg v. Katz*, this Court found that "it is inconceivable that reasonable investors would have proceeded to invest, knowing that Katz intended for Robins," who had multiple felony convictions, "to be the Chief Operating Officer of the company and to have control over corporate funds" without "full and complete disclosure" of Robins's criminal record.[222]  Even then, this Court reasoned that Robins "would only be permitted to play carefully constrained and supervised roles."[223]

I likewise find it inconceivable that if Bouri had been truthful about why and how he departed from Time Warner and the particulars of the allegations made against him, Kishan would have made Bouri the head of HR, finance, or the U.S. consulting business without any oversight.  Bouri was terminated from Time Warner in part because his supervisors had lost confidence in his business judgment.  He also was terminated after an investigation into allegations of inappropriate sexual comments and behaviors in the workplace.  Kishan was looking for a partner who could handle the entire U.S. consulting business because Kishan was too focused on the European market to give the U.S. market the attention it required.  It is highly

---

[222]    872 A.2d 568, 587 (Del. Ch. 2004).

[223]    *Id.* at 586.

52

unlikely that Kishan would have handed over that entire section of his business to Bouri if he had known that a sophisticated business like Time Warner had lost confidence in Bouri's business judgment.[224]   Furthermore, the nature of the allegations made at Time Warner would have been material information for Kishan and Trascent to have before consenting to Bouri's role as the head of Trascent's HR.

Nor is it conceivable that had Kishan known the truth about Bouri's finances, he would made him a member of Trascent.[225]  Kishan was looking for someone to invest in the company, and members had to be able to invest cash when necessary.[226] Kishan testified that the only reason he accepted Bouri's promissory note in exchange for Bouri's equity was that he believed Bouri was a wealthy man and would be able to invest cash when Trascent needed.[227]  Instead, Bouri refused to give

---

[224]  JX 306, at TW0002.

[225]  It is also questionable whether Kishan would have made Bouri the head of finance if he knew the truth.  Kishan made a presentation to the Board in which he pointed out that Shaffer had "recently eloped" and been "involved in multiple housing sale transactions."  JX 139.  He further stated, "I had warned [Bouri] on several occasions that in other smaller consulting firms I had been with, both CFO's were siphoning cash." Id.  If Kishan was this concerned about the CFO's elopement and multiple house sales, he likely would have been similarly concerned about putting a man with significant financial woes at the head of finance for Trascent.  This inference is supported by emails from Kishan after Bouri's departure where he reiterates that he thought Bouri was "rich" and thanks Shaffer for keeping an eye on the accounts that Bouri accessed.  JX 353.

[226]  JX 56; JX 21.

[227]  Tr. 24-25 (Kishan).

Trascent needed cash infusions and took loans and advances from the cash-strapped company.[228] The fact that Bouri did not have cash to infuse should Trascent need it, as it in fact did, was material information for Kishan to consider.

Once Bouri embarked upon his explanation for his departure from Time Warner, he had to give Kishan a "full and open disclosure" of the real circumstances around that departure.[229] Once Bouri volunteered information to Kishan that gave a certain impression about Bouri's financial status, Bouri had to correct that impression by telling Kishan about the true state of his financial affairs. While it is hard to believe Kishan still would have formed Trascent, made Bouri a member, and entrusted Bouri with the U.S. business and Trascent's operations had he known the truth of these matters, at the very least there would have been different constraints on Bouri's ownership and role at Trascent. Instead, Kishan offered Bouri "complete independence, decision-making without political entanglements, . . . and the ability to exert [his] vision and leadership and harness the power of a talented global team to execute [his] vision."[230] Thus, "it is clear that [Bouri] made material

---

[228] Tr. 53 (Kishan); Tr. 437-38 (Patel Kishan); JX 77; JX 117; JX 124; JX 331, at 81-84; JX 353.

[229] *Kronenberg*, 872 A.2d at 586.

[230] JX 23.

misrepresentations of facts that would have been important to a reasonable [person] considering [this business venture]."[231]

Bouri argues that Trascent did not justifiably rely on Bouri's statements for two reasons: (1) the negotiations to form Trascent took place over a long period of time and (2) Kishan needed to "rejuvenate [UMS Advisory's] struggling business."[232] Bouri never corrected the misrepresentations he made to Kishan,[233] and nothing in the record suggests the information became stale over the course of Trascent's formation. The time between when Bouri made the statements and when

---

[231]    *Kronenberg*, 872 A.2d at 587.

[232]    Def.'s Answering Br. 14. Bouri also argues that his "employment history and personal wealth were [not] important considerations" for Trascent because "1) Kishan's admitted desire to bring in someone like Bouri who had more 'capacity, talent and capability' than UMS ever had, who would be 'instrumental' in 'transforming' UMS into a global force, and whose ambition was 'far greater' than what UMS had for itself in the past; 2)" that Kishan failed to run a background check on Bouri; "3) Kishan's omission of personal wealth as a requirement for partnership when Bouri questioned him about the prerequisites; and 4) Trascent's willingness to fund initial capital contributions for all three members through non-recourse promissory notes." Def.'s Sur-Reply Br. 8-9. The first, second, and fourth arguments address reliance by Kishan that was in direct response to the lies Bouri told him. Kishan's reliance was justifiable based on the information that Bouri gave him. He had no duty to gather independent information. *See* Restatement (Second) of Contracts § 172 (Am. Law. Inst. 1981). As for the third argument, the list of prerequisites in the cited email comes after extensive discussion of purchasing equity for cash. JX 21. This fact actually cuts against Bouri's argument and makes clear that putting cash into the business was an essential prerequisite to becoming a member.

[233]    In fact, he maintained that he had resigned from Time Warner until his third day of testimony at trial. *See infra* Section C.

Trascent was ultimately formed therefore is irrelevant. And as to whether it was UMS Advisory's financial struggles that primarily motivated Kishan to bring on Bouri, the evidence does not support this contention. Patel Kishan, UMS Advisory's Director of Finance, credibly testified that in 2012 UMS Advisory made a net profit of over $915,000 in the U.S. alone. [234] Kishan testified that UMS Advisory paid bonuses every year except 2008.[235] These facts undercut Bouri's position that Kishan was so desperate to bring on Bouri that Kishan would have ignored the circumstances surrounding Bouri's termination from Time Warner and that Bouri was struggling with his personal finances. Moreover, even if UMS Advisory was struggling, the reliance is still justified even if the statements were not the sole factor influencing the reliance.[236] A reasonable person would have considered it important to know that the person he was going to make a member in a new entity and to whom he was handing the U.S. business and worldwide operations had been terminated from his last job after an investigation into his management style and inappropriate behavior and was struggling to make ends meet financially. Thus, Trascent has proven the fourth element of its fraudulent inducement claim by a preponderance of the evidence.

---

[234]     Tr. 235-36 (Patel Kishan).

[235]     Tr. 7-8 (Kishan).

[236]     Restatement (Second) of Contracts § 167 cmt. a (Am. Law. Inst. 1981).

### 4. Trascent was damaged as a result of its justifiable reliance

The final element of the fraudulent inducement claim is satisfied because Trascent entered into the Employment Agreement and LLC Agreement when it otherwise would not have.[237] Thus, Trascent has proven each element of its fraudulent inducement claim by a preponderance of the evidence and shown that Bouri fraudulently induced Trascent to enter into the LLC Agreement and the Employment Agreement.

### B. Remedies

Trascent essentially seeks three remedies for its fraudulent inducement claim: (1) rescission of the Employment Agreement; (2) a declaratory judgment that the LLC Agreement is unenforceable by Bouri; and (3) attorneys' fees and costs.[238]

### 1. Rescission of the Employment Agreement

"By ordering rescission, whether at law or in equity, the court endeavors to unwind the transaction and thereby restore both parties to the status quo."[239] Legal

---

[237] *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015) ("The plaintiff can claim causally related harm because it entered into an agreement it otherwise would not have signed.").

[238] PTO § V.A. In the alternative, should the Court have found that the contracts were not induced by fraud, Plaintiff requested a declaration that Defendant was terminated for cause and related monetary relief. PTO § I. Because I held that the contracts were induced by fraud, I do not consider the alternative arguments and requests for relief.

[239] *Ravenswood Inv. Co. v. Estate of Winmill*, 2018 WL 1410860, at *21 (Del. Ch. Mar. 21, 2018), as revised (Mar. 22, 2018).

57

rescission refers to the "judicial declaration that a contract is invalid and a judicial award of money or property."[240]  Here, Trascent appears to request legal rescission of the Employment Agreement.[241]  Bouri argues, relying on *Ravenswood Investment Co. v. Estate of Winmill*,[242] that rescission is not available in this case because it is not possible to return the parties to the *status quo ante* for two reasons.[243]  First, "Bouri contributed greatly to Trascent's business during his tenure, and removing the Employment Agreement would permit Trascent to reap the benefits of his contribution while Bouri loses all benefits and protections."[244]  Second, Bouri argues that he was limited in his post-termination employment opportunities because he abided by the eighteen-month post-termination noncompete provision in the Employment Agreement.[245]  Neither of these arguments convince me that I cannot return the parties to the *status quo ante*.

While it may be true that Bouri contributed to the business of Trascent, it is also true that Bouri cost Trascent a significant amount of money during his tenure.

---

[240]    *Id.*

[241]    PTO ¶ V.A.1.

[242]    2018 WL 1410860, at *22 (Del. Ch. Mar. 21, 2018), as revised (Mar. 22, 2018).

[243]    Def.'s Answering Br. 20.

[244]    *Id.* at 20-21.

[245]    *Id.* at 21.

In the second half of 2013, Bouri increased the size of the firm from ten employees to eighteen.[246]  In 2012, the net income of UMS Advisory was $915,000, but in 2013, after Bouri signed on, the net income was $78,000.[247]  In 2014, Trascent did not make a profit at all.[248]  The benefits bestowed by Bouri and the expenses incurred by Trascent are comparable.  No further compensation of the parties is required to substantially return them to the pre-Employment Agreement status quo.

Bouri also argues that he was limited in his post-termination employment opportunities because he abided by the eighteen-month post-termination noncompete provision in the Employment Agreement.[249]  The noncompete provision in the Employment Agreement prevents certain actions "in the business of providing consulting services in the real estate/facilities management market anywhere within the United States and in such other jurisdictions as the Company is then providing such services or has provided such services within the prior 24 months."[250]  Bouri separated from Trascent in April 2015 and moved to Beirut, Lebanon, in August 2015 "[f]or simply personal reasons," including being closer to

---

[246]    Tr. 251 (Patel Kishan).

[247]    Tr. 244 (Patel Kishan).

[248]    Tr. 200 (Kishan).

[249]    Def.'s Answering Br. 21.

[250]    JX 55, at 8.

59

his aging mother.[251]   He has resided there since.[252]   In November 2015, Bouri was diagnosed with certain medical conditions that make it dangerous for him to travel to the U.S., Europe, Asia, or anywhere requiring plane travel.[253]   Neither party has pointed to any evidence that Trascent provided any real estate/facilities management consulting services in or around Lebanon during the twenty-four months before Bouri's departure in April 2015 such that the noncompete provision would prevent Bouri from finding employment in Lebanon if he so wished.   Therefore, I find that Bouri chose not to work due to personal reasons.   As such, I can place the parties in substantially the same position they were in before the Employment Agreement by rescinding the Employment Agreement, making rescission an appropriate remedy.

### 2. Declaratory judgment that the LLC Agreement is unenforceable by Bouri

When "there is fraud in the inducement, the contract is enforceable against at least one party," and the "agreement is 'voidable' at the option of the innocent party."[254]   Trascent requests a declaratory judgment that the LLC Agreement is

---

[251]   Tr. 802-03 (Bouri); Bouri Aff. ¶ 2 (Sept. 19, 2017).

[252]   Bouri Aff. ¶ 2 (Sept. 19, 2017).

[253]   Def.'s Mot. for Protective Order ¶¶ 2-11 (Sept. 19, 2017).

[254]   *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr. ex rel. Christiana Bank & Tr. Co.*, 28 A.3d 1059, 1067 (Del. 2011) (quoting *Dougherty v. Mieczkow*ski, 661 F. Supp. 267, 274 (D. Del. 1987)).

unenforceable by Bouri. Bouri's only response is that the LLC Agreement was not procured by fraud.[255] As discussed at length above, I find that the LLC Agreement was procured by fraud, and therefore, I grant Trascent the declaratory judgment it seeks.[256]

### 3. Attorneys' fees and costs

Trascent requests attorneys' fees and costs in four different ways. Trascent requests these fees as: (1) "restitution sufficient to return Trascent to the position that it would have been had the [Employment Agreement] not been entered, including recovery of its own attorneys' fees and costs incurred in connection with the [Employment Agreement] and recovery of all attorneys' fees and costs advanced to Bouri for indemnification in connection with this litigation and pre-judgment interest on all amounts so recovered;"[257] (2) "restitution sufficient to return Trascent

---

[255]  Def.'s Answering Br. 21.

[256]  Bouri also seeks three forms of relief: (1) a declaration that Kishan terminated Bouri without cause, that Bouri is entitled to advancement, and that Bouri is the rightful owner of forty-three percent of the Class A units of Trascent; (2) an award of damages and attorneys' fees and costs; and (3) an injunction requiring Plaintiff to turn over all of Bouri's personal property remaining at its offices. PTO § V.B. Bouri withdrew his request for advancement as moot in the pretrial stipulation. PTO 2 n.2. My above findings moot Bouri's requests for a declaratory judgment or an award of attorneys' fees and costs. While Bouri made his request for return of his personal property in his counterclaim and introduced evidence at trial relating to the personal property, he omitted the request from the Pretrial Stipulation and did not mention it in the post-trial briefing. All Bouri's requests for relief therefore are denied.

[257]  PTO ¶ V.A.1.

61

to the position that it would have been had the [LLC Agreement] not been entered, including recovery of its own attorneys' fees and costs incurred in connection with the [LLC Agreement] and recovery of all attorneys' fees and costs advanced to Bouri for indemnification in connection with this litigation;"[258] (3) "[a]n award of Trascent's reasonable costs of investigation, litigation and appeal, including reasonable attorneys' fees, costs, and disbursements;"[259] and (4) "[a]n award of immediate reimbursement by Bouri of all sums advanced by Trascent to indemnify him for his attorneys' fees and costs incurred in this litigation."[260]

As to the requests for the return of the attorneys' fees and costs advanced to Bouri, those claims are denied. The Court heard Bouri's advancement case and found that Bouri is entitled to advancement under both the Employment Agreement and the LLC Agreement. Trascent appealed that decision to the Supreme Court of Delaware, and the Supreme Court affirmed the Court's decision. Bouri therefore is entitled to advancement until a final, non-appealable order has been entered in this plenary action.[261] Should this post-trial memorandum opinion be affirmed or should

---

[258]   *Id.* ¶ V.A.2.

[259]   *Id.* ¶ V.A.5.

[260]   *Id.* ¶ V.A.6.

[261]   8 *Del. C.* § 145(e) ("Expenses (including attorneys' fees) incurred by an officer or director of the corporation in defending any civil, criminal, administrative or

Bouri choose not to appeal this decision, Trascent may then be entitled to a return of advanced attorneys' fees and costs.[262] To the extent that Trascent is arguing that Bouri is not entitled to indemnification, those claims are not yet ripe as there is no final, non-appealable judgment in this plenary action.[263] Thus, this relief is denied.

As for the return of Trascent's own attorneys' fees and costs, Trascent requests those (1) as "[a]n award of Trascent's reasonable costs of investigation, litigation and appeal, including reasonable attorneys' fees, costs, and disbursements;"[264] and (2) under a theory of restitution related to the fraudulent inducement of both the Employment Agreement and the LLC Agreement.[265] As to the first request, Trascent does not argue that an exception to the American Rule applies, and thus, that request is denied.[266] As for the second request, Trascent requests "restitution sufficient to return Trascent to the status quo before Bouri joined Trascent; specifically, . . . recoupment of all attorneys' fees and litigation

---

investigative action, suit or proceeding may be paid by the corporation *in advance of the final disposition* of such action, suit or proceeding . . . ." (emphasis added)).

[262] *See* Edward P. Welch, Robert S. Saunders & Jennifer C. Voss, *Folk on the Delaware General Corporate Law* § 145.08 (6th ed. 2018).

[263] *See Scharf v. Edgcomb Corp.*, 864 A.2d 909, 919-20 (Del. 2004).

[264] PTO ¶ V.A.5.

[265] *Id.* ¶¶ V.A.1-2.

[266] See Section II.C *infra* for a discussion of the American Rule. I address separately Trascent's Motion for Sanctions and the fees sought therein.

63

costs it has expended to litigate this matter."[267]  Trascent points to no authority that supports this request.  In the context of rescission, restitution is awarded as a way of returning consideration that needs to be returned when the contract is "unmade."[268]  The attorneys' fees and costs Trascent has paid to bring its case were not part of that consideration.  Moreover, "[t]he cost[s] of litigation are not available in this Court as damages . . .[except] under special circumstances not present here."[269]  Thus, this relief is also denied.

## C.    Sanctions

"Candor and fair-dealing are, or should be, the hallmark of litigation and required attributes of those who resort to the judicial process."[270]  Trascent seeks

---

[267]    Pl.'s Opening Br. 27.

[268]    Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.04 (2017).

[269]    *Morabito v. Harris*, 2003 WL 22290934, at *1 (Del. Ch. Sept. 29, 2003); *E. I. Du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1994 WL 465547, at *7 (Del. Super. Aug. 3, 1994) ("I cannot change the common law rule by disguising the claim for attorney's fees under the cloak of compensatory damages."); *cf. Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997) (exceptions to the American Rule include "cases where the underlying (pre-litigation) conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages"), *aff'd*, 720 A.2d 542 (Del. 1998); *Cantor Fitzgerald, L.P. v. Cantor,* 2001 WL 536911, at *3 (Del. Ch. May 11, 2001) ("[T]his Court, exercising the discretion given it, determined that damages, as measured by attorneys' fees and expenses spent to address the defendants' conduct, is an appropriate remedy for this egregious breach of the duty of loyalty.").

[270]    *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461 (Del. 1999).

sanctions against Bouri for repeatedly misrepresenting in discovery and before the Court the true nature of his departure from Time Warner. It is understandable that Bouri would be hesitant to share the true details of his departure from Time Warner, but I find that his lack of candor in discovery and during trial endangered the legitimacy of the litigation process and, thus, is deserving of sanctions.

"The American Rule applies in Delaware."[271] "Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court."[272] "[Delaware] courts have, however, recognized bad faith litigation conduct as a valid exception to that rule."[273] "To justify an award under the bad faith exception, 'the Court must conclude that the party against whom the fee award is sought has acted in subjective bad faith.'"[274]

---

[271] *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1221 (Del. 2012).

[272] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850 (Del. Ch. 2005).

[273] *Gatz Props.*, 59 A.3d at 1222.

[274] *K & G Concord, LLC v. Charcap, LLC*, 2018 WL 3199214, at *1 (Del. Ch. June 28, 2018) (quoting *Reagan v. Randell*, 2002 WL 1402233, at *3 (Del. Ch. June 21, 2002)).

"The party seeking a fee award bears the stringent evidentiary burden of producing 'clear evidence' of bad-faith conduct."[275]

The purpose of the bad faith exception "is not to award attorney's fees to the prevailing party as a matter of right, but rather to . . . [protect] the integrity of the judicial process.'"[276] "Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[277] Bad faith has also included "misleading the court, altering testimony, . . . changing position on an issue,"[278] and perjury.[279]

Trascent points to at least three instances where, in bad faith, Bouri misrepresented the nature of his departure from Time Warner during these proceedings in sworn statements and while under oath. The first was in response to

---

[275]   *Beck*, 868 A.2d at 851 (citing *Shapiro v. Healthcare Acq., Inc.*, 2004 WL 878018, at *1 (Del. Ch. Apr. 20, 2004) and *Arbitrium (Cayman Islands) Handels AG*, 705 A.2d at 232).

[276]   *In re Shawe & Elting LLC*, 2016 WL 3951339, at *12 (Del. Ch. July 20, 2016) (quoting *Brice v. State Dept. of Corr.*, 704 A.2d 1176, 1179 (Del. 1998)), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 142 (Del. 2017).

[277]   *Gatz Props.*, 59 A.3d at 1222 (quoting *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)).

[278]   *Beck*, 868 A.2d at 851.

[279]   *Choupak v. Rivkin*, 2015 WL 1589610, at *23 (Del. Ch. Apr. 6, 2015), *aff'd*, 129 A.3d 232 (Del. 2015).

interrogatories; the second was in response to requests for admissions; and the third was while testifying at trial. I find that this constitutes bad faith litigation conduct that warrants the shifting of attorneys' fees and costs as sanctions.

The interrogatory asks, "Describe in detail the circumstances regarding your termination from Time Warner, including identifying all persons with knowledge of facts regarding the decision to terminate your employment."[280] Bouri responds,

> Defendant objects to this Interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and harassing. Defendant also objects to this Interrogatory to the extent it calls for disclosure of information or communications protected by the attorney-client privilege and/or attorney work product doctrine. Subject to and without waiving these objections and the General Objections,
>
> Defendant became employed by Time Warner Inc. ("TWX") in April 2010. Initially, defendant reported to the EVP/Chief Administrative Officer, Pat Fili-Krushel, but she subsequently left TWX in November 2010. Defendant and all other administrative functions began reporting to the EVP/CFO, John Martin.
>
> In May 2011, Defendant tendered his voluntary resignation from TWX based on his frustrations with his day-to-day professional working relationship with his supervisor, Defendant's overall professional unhappiness at the company, and Defendant's view that his business philosophy did not fit with TWX's risk averse/conservative business philosophy. Upon further discussions with TWX, John Martin, and Mark Henderson (Director of Human Resources), TWX offered to

---

[280]    JX 305, at 5.

67

designate Defendant's departure as a termination without cause, which triggered the payout of certain benefits to Defendant. Defendant agreed to this and the termination without cause was made effective May 6, 2011. TWX never informed or advised Defendant that any grounds existed to discipline him or terminate him for cause.[281]

The first request for admission asks, "Admit that you were terminated by your former employer, Time Warner Inc. ("Time Warner") for reasons concerning or relating to allegations of sexual harassment or misconduct."[282] Bouri responds,

> Mr. Bouri objects to this Request on the grounds that it is vague, ambiguous, and harassing. Mr. Bouri also objects to this Request on the grounds that "misconduct" is not defined. Subject to and without waiving these objections, Mr. Bouri denies this Request. Mr. Bouri tendered his voluntary resignation and, after further discussion with Time Warner, the parties agreed to designate his separation from the company as a termination without cause. Time Warner never informed or advised Mr. Bouri that allegations of sexual harassment or misconduct had been made against him, or that his termination was due to or related to any such allegations.[283]

The second request for admission asks, "Admit that an employee of Time Warner made allegations against you of sexual harassment or misconduct during the time you were employed at Time Warner."[284] Bouri responds,

---

[281]    *Id.* at 5-6.

[282]    JX 304, at 1.

[283]    *Id.* at 1-2.

[284]    *Id.* at 2.

Mr. Bouri objects to this Request on the grounds that it is vague, ambiguous, and harassing. Mr. Bouri also objects to this Request on the grounds that "misconduct" is not defined. Subject to and without waiving these objections, Mr. Bouri denies this Request. Mr. Bouri was never made aware that any allegations of sexual harassment or misconduct had been made against him during his employment at Time Warner. However, prior to his termination from Time Warner, Mr. Bouri was interviewed in connection with an internal investigation into individuals who worked in his department and he was asked questions about, among other things, alleged comments of a sexual nature that had been attributed to him. Time Warner never advised Mr. Bouri regarding the findings or outcome of the investigation and he was never disciplined for any alleged sexual harassment or misconduct.[285]

The third request for admission asks, "Admit that you did not disclose to Plaintiff that you were terminated by Time Warner for reasons concerning or relating to allegations of sexual harassment or misconduct." Bouri responds,

Mr. Bouri objects to this Request on the grounds that it is vague, ambiguous, and harassing. Mr. Bouri also objects to this Request on the grounds that "misconduct" is not defined. Subject to and without waiving these objections, Mr. Bouri admits this Request. Mr. Bouri further states that Time Warner never informed or advised him that allegations of sexual harassment or misconduct were made against him, or that his termination was due to or related to any such allegations.[286]

---

[285]     *Id.*

[286]     *Id.*

At trial, Bouri repeatedly testified that he voluntarily resigned from Time Warner.[287]

The Business Records and Bouri's own testimony both show that Bouri lied under oath about the following:

- Bouri did not voluntarily resign from Time Warner but was terminated without cause.[288] This termination without cause was explicitly stated in the notice of termination Time Warner gave to and reviewed with Bouri[289] and in the termination agreement that Bouri signed.[290] Furthermore, the termination agreement explicitly stated that the officer resignation letter Bouri signed did not change the nature of his termination without cause.[291] Finally, Bouri eventually admitted that he did not resign before he was terminated from Time Warner.[292]

---

[287] Tr. 520 (Bouri) ("Q. Are those your words that you resigned from Time Warner? A. I did, and, yes, those are my words. Q. You didn't voluntarily resign from Time Warner, did you, sir? A. Yes, I did."); Tr. 521 (Bouri) ("I was not required to resign. I offered my resignation and tendered it to Time Warner."); Tr. 620 (Bouri) ("Q. Okay. Now, Mr. Bouri, did you resign from Time Warner? A. I did.").

[288] JX 306, at TW0010-11; Tr. 620 (Bouri).

[289] JX 306, at TW0010.

[290] *Id.* at TW0011-15.

[291] *Id.* at TW0011.

[292] Tr. 855 (Bouri).

- Bouri did not depart from Time Warner due to "frustrations with his day-to-day professional working relationship with his supervisor, Bouri's overall professional unhappiness at the company, and Bouri's view that his business philosophy did not fit with [Time Warner's] risk averse/conservative business philosophy;"[293] instead, he was terminated without cause because his superiors "no longer had confidence in his business judgment."[294] Further, Bouri was terminated at the conclusion of an investigation into allegations of inappropriate workplace behaviors, including mismanagement and sexual harassment.[295]

- Bouri knew about the allegations of mismanagement and sexual misconduct made against him.[296] He met with a Time Warner attorney who informed Bouri of the allegations against him and recorded Bouri's specific denials to

---

[293]  JX 305, at 5-6.

[294]  JX 306, at TW0002.

[295]  *Id.* at TW0002.

[296]  *Id.* at TW0052 (including notes on Bouri's specific and detailed denials of the allegations against him); *id.* at TW0045 (email from Bouri to Henderson stating "I am surprised that you are allowing people that have levied these wrongful accusations access to my affairs.").

each allegation.[297]  Moreover, Bouri eventually admitted that he knew about the specific allegations against him.[298]

Bouri argues that his conduct is not sanctionable because he has the right to present his explanation for why and how he separated from Time Warner and that he has consistently maintained that he resigned and that the resignation was structured as a termination without cause.[299]  I agree that every litigant has a right to present his or her side of the story, but that does not allow for the submission of false statements.  Bouri's consistent assertion that he voluntarily resigned is not consistent with the independent facts.[300]  Moreover, his side of the story is not consistent with his eventual testimony that he did not resign.[301]

Bouri also argues that his behavior was not sanctionable because it is merely inconsistent.  This argument relates to Bouri's sworn statements about the internal investigation at Time Warner.  Bouri does not deny that he lied in at least three of his responses.  Instead, Bouri argues that his answer to Request for Admission No. 71 makes his answers internally inconsistent.  First, this is not true.  Bouri's answer

---

[297]    JX 306, at TW0052.

[298]    Tr. 557 (Bouri).

[299]    Def.'s Opp. to Pl.'s Mot. for Sanctions 1-2, 7.

[300]    JX 306, at TW0001-03, TW0010-21.

[301]    Tr. 855 (Bouri).

72

to Request for Admission No. 71 says, in relevant part, "Mr. Bouri was interviewed **in connection with an internal investigation into individuals who worked in his department** and he was asked questions about, among other things, alleged comments of a sexual nature that had been attributed to him."[302] This answer is consistent with his other answers because it strongly suggests that he was questioned only ancillary to an investigation into other people in his department and implies that comments were mistakenly attributed to him. Second, even if this answer was actually inconsistent, it does nothing to change the fact that Bouri *lied* in his other responses. Contrary to Bouri's argument, this alleged inconsistency did not somehow shift the burden to Trascent to ask Bouri to "clarify or reconcile" his discovery responses. Bouri knew all along that people at Time Warner made allegations against him.[303] And if he had somehow forgotten, then the Time Warner documents would have refreshed his recollection. Bouri had a duty to tell the truth in his discovery responses and before this Court. He failed in that duty.[304] Trascent has carried its burden of showing by clear evidence that Bouri took part in bad faith

---

[302]   JX 304, at 2 (emphasis added).

[303]   JX 306, at TW0052 (including notes on Bouri's specific and detailed denials of the allegations against him); *id.* at TW0045.

[304]   *See* Tr. 550-51 (Bouri) (trial testimony affirming that his discovery answers that he was never informed of any allegations made against him at Time Warner were true).

litigation tactics by misleading Trascent and the Court in sworn statements about the events surrounding his departure from Time Warner.

The only question then is the appropriate measure of sanctions. "The Court of Chancery has broad discretion in fixing the amount of attorney fees to be awarded."[305] "The Court evaluates the totality of a party's misconduct to determine whether the party litigated in bad faith and to determine the amount of fees to award."[306] "In exercising its discretion to determine an appropriate sanction for bad faith and vexatious litigation conduct, this Court has shifted a portion of, and on occasion the entirety of, the opposing side's attorneys' fees."[307] Because Bouri's false statements go to the heart of two of the five counts brought by Trascent, I award Trascent its reasonable attorneys' fees and costs incurred in bringing the Motion for Sanctions and two-fifths of its reasonable attorneys' fees and costs incurred in this litigation.

## III. CONCLUSION

For the foregoing reasons, the Employment Agreement is rescinded; I grant a declaratory judgment that the LLC Agreement is unenforceable by Bouri; and I

---

[305] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 547 (Del. 1998).

[306] *In re Shawe*, 2016 WL 3951339, at *19.

[307] *Id.*

award Trascent all of its reasonable attorneys' fees and costs incurred in bringing the Motion for Sanctions and two-fifths of its reasonable attorneys' fees and costs incurred in this litigation. All other relief is DENIED. Trascent shall prepare and file with the Court within ten business days an implementing order stating the amount of the reasonable attorneys' fees and costs it incurred in bringing the Motion for Sanctions and two-fifths of the litigation, along with an affidavit documenting the same. The implementing order shall provide for the sanctions to be paid within ten business days of entry of that order.

**IT IS SO ORDERED**.